## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 18-cv-12358-LTS**

AIRBNB, INC.,

      Plaintiff,

v.

CITY OF BOSTON,

      Defendant.

## CITY OF BOSTON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant, City of Boston ("City"), respectfully requests that this Court deny Plaintiff, Airbnb, Inc.'s ("Airbnb"), Motion for Preliminary Injunction.  In its Motion, Airbnb challenges three sections of the City's Ordinance Allowing Short-Term Residential Rentals in the City of Boston (the "Ordinance"):  Section 9-14.9(a), Section 9-14.10(b), and Section 9-14.11.  See Ordinance, attached hereto as Exhibit A.  But Airbnb has failed to establish the four prongs necessary for this Court to grant injunctive relief.  Specifically, Airbnb has failed to demonstrate a substantial likelihood of success on the merits because, among other things, it (1) does not have standing to challenge a provision directing action of or imposing penalties against third parties; (2) has not demonstrated that the Ordinance treats it as speaker or publisher of third-party content; and (3) has not demonstrated that it or its customers have an expectation of privacy in information sought by the City.  As a result, Airbnb's request for a preliminary injunction must fail.

I.      **FACTUAL BACKGROUND**

A.      **The Ordinance**

The Ordinance, which took effect on January 1, 2019, regulates short-term rentals of residential units.  Enacted in response to the growing practice of renting residential units to visitors (often using platforms like Airbnb), the Ordinance is intended to strike a balance between allowing Bostonians to access some of the economic opportunities created by the short-term rental market and limiting the negative impact that short-term rentals have on the availability of permanent housing opportunities for Boston's residents.  See January 19, 2018 letter from Mayor Walsh to Boston City Council, attached hereto as Exhibit B.  The Ordinance restricts which units may be used as short-term rentals, requires registration of units in order to be used as short-term rentals, and imposes certain restrictions and obligations on businesses (like Airbnb) that facilitate and collect payments for short-term rentals.  See Exhibit A.

The Ordinance permits the owners (the "Operator") of certain types of units to rent them out for stays of fewer than twenty-eight consecutive days (a "Short-Term Rental").  Id. at §9-14.2.  There are three permissible types of Short-Term Rentals: (1) a Home Share Unit—a residential unit that is the Operator's primary residence (meaning the Operator resides there at least nine months out of the year) and which may be rented when the Operator is not present; (2) a Limited Share Unit—a residential unit that is the Operator's primary residence, a portion of which is rented out while the Operator is present; and (3) an Owner-Adjacent Unit—a residential unit located in a two or three-family dwelling owned by the Operator, where the Operator resides in one of the other units in the building.  Id. at §§9-14.2, 9-14.5.  In addition, the Ordinance does not apply to (and therefore allows) rentals under twenty-eight days in bed and breakfasts,

licensed lodging houses, corporate employee housing, or units under contract with hospitals as accommodation for patients and their families.  Id. at §9-14.4B.

The Ordinance prohibits Short-Term Rentals in a variety of other circumstances.  Short-Term Rentals may not be conducted in a unit that is not the owner's primary residence (other than the units included in the limited exception for Owner-Adjacent Units).[1]  Id. at §§9-14.2, 9-14.5.  Therefore, investor-owned units are not eligible for Short-Term Rental use.  Certain other residential units are also ineligible to be offered as a Short-Term Rental because they are: (1) affordable housing; (2) subject to a law prohibiting the leasing or sub-leasing of the unit as a Short-Term Rental; (3) designated as "Problem Properties" or "Public Nuisance Properties" by City; or (4) have received three or more violations of the Ordinance or of any local or state law relating to excessive noise, improper disposal of trash, disorderly conduct, or other similar conduct, within a six-month period.  Id. at §9-14.4A.  To assist with determining whether a unit falls into one of the four categories described above, the City maintains a dataset (the "Short-Term Rental Eligibility List" or "List") that lists eligibility categories as spelled out in the Ordinance for each unit in the City.  The List is available to view or download on the City's website or through an Application Programming Interface, and is updated daily as new information is received from City departments.  See Affidavit of Stefanie Costa Leabo, attached hereto as Exhibit C, at ¶¶ 2, 4.[2]  Using the List, any member of the public, an applicant, or any Booking Agent, may easily tell whether a unit is eligible be registered if it has a "Y" (standing

---

[1]     The City uses residential tax exemption information to help it determine "primary residence" for purposes of a unit's eligibility under the Ordinance.  The City offers a residential tax exemption to homeowners who occupy their properties as their principal residences, which for purposes of the exemption is the address from which they file their Massachusetts income tax returns.  See City of Boston website at: https://www.boston.gov/departments/assessing/how-file-residential-exemption

[2]     See also website:  https://data.boston.gov/dataset/short-term-rentals/resource/83621b97-9a00-4aa7-bf43-28cae04969d4.

for "Yes") in any of the columns relating to the three permissible Short-Term Rental types: a Home Share Unit, a Limited Share Unit, or an Owner Adjacent Unit.[3]  See id. at ¶ 3.

In order to lawfully rent out an eligible unit, an Operator must register the unit with the City.  See Exhibit A at §9-14.6.  To register, an Operator must submit an application via the City's online registration tool and provide the street address of the unit, the type of Short-Term Rental the Operator wishes to operate, and his or her relationship to the unit.  See Exhibit C at ¶ 5.[4]  After the online registration process is complete, the application is sent to the City's Inspectional Services Department ("ISD") for review.  See id.  In performing its review of an application, ISD uses the List to determine whether a unit may be registered.  See Affidavit of William P. Christopher and attached Commissioner's Bulletin, attached as Exhibit D.  ISD will not approve an application for a unit that falls into a category that renders it ineligible to be registered.[5]  Id.  Once ISD approves an application, ISD assigns the Operator a unique registration number for the unit.  See Exhibit C at ¶ 6.  A registration number is valid for one year and the Operator must include it on any listing advertising the Short-Term Rental.  See id. Within thirty days after an Operator registers a Short-Term Rental, he or she is responsible for notifying abutters of the registration.  See Exhibit A at §9-14.5(j)(iii).

---

[3]     For example, using the List, a person looking up a unit is able to see whether the unit is listed as eligible for a category of Short-Term Rentals, whether it is listed as owner-occupied or income restricted, whether it is deemed a "Problem Property" by the City, or whether it falls into other categories that render it ineligible.

[4]     The online application tool is available at https://onlinepermitsandlicenses.cityofboston.gov/isd/ShortTermRental/Views/CDR/BusinessLicense/Intake/SiteLocation.aspx.

[5]     For example, if a unit on the Short-Term Eligibility List shows a "Y" for the category "income restricted," ISD will not approve the application.  ISD will, however, amend the List if an applicant demonstrates that the information about a unit is incorrect.  See Draft Bulletin, Exhibit D at ¶ 3.

### B.   The Ordinance As Applied to Booking Agents Like Airbnb

The Ordinance also creates rules and requirements for "Booking Agents," like Airbnb, defined as "any person or entity that facilitates reservations or collects payment for a Short-Term Rental for or on behalf of an Operator."  See Exhibit A at §9-14.2.  Airbnb challenges three provisions of the Ordinance that regulate Booking Agents:   Section 9-14.9(a), Section 9-14.10(b), and Section 9-14.11.[6]

### 1.   Section 9-14.9(a)

**Section 9-14.9(a)** provides:

> Any person who offers a unit as a Short-Term Rental, or any Booking Agent who accepts a fee for booking a unit as a Short-Term Rental, where such unit is not an eligible Residential Unit, shall be fined three hundred dollars ($300) per violation per day.

This section provides for fines imposed by the Commissioner of ISD (the "Commissioner") against Booking Agents who collect a fee for performing booking services for units that are not eligible to be registered as Short-Term Rentals.  Id.  The fine can only be imposed on a Booking Agent (whether it runs a website or not) for actually handling the booking transaction for a unit for a fee.  The fine cannot be imposed based simply upon the listing or advertising of such a unit on a website operated by the Booking Agent.  Id.  In order to clarify how ISD will enforce this provision, the Commissioner intends to promulgate regulations substantially in the form of the Draft Commissioner's Bulletin attached to the Affidavit of William P. Christopher (Exhibit D).

---

[6]   There are two additional requirements for Booking Agents in the Ordinance that Airbnb has not challenged.  The Ordinance requires Booking Agents to permit Operators to list their City registration numbers on listings.  See Exhibit A at §9-14.5(j)(ii).  Second, the Ordinance requires a Booking Agent to enter into an agreement with the City to collect and remit excise tax if it provides that service to Operators.  Id. at §9-14.7.  That excise tax provision differs from the mechanics for collecting and remitting excise tax set forth in the subsequently-enacted Massachusetts Short Term Rental Statute, Ma. St. 2018, c. 337, and the City intends to follow the controlling state statutory scheme.

Instead of placing the burden on Booking Agents to determine whether a unit is not eligible, the Commissioner will only fine a Booking Agent that collects a fee for booking a unit that the List categorizes as not eligible to be registered.[7]   See id.   If the List fails to list a unit as "not eligible," a Booking Agent shall not be fined for collecting a fee to book it, regardless of whether the unit is actually not eligible to be registered.   Therefore, a Booking Agent is not required to conduct a separate inquiry beyond consulting the List in order to avoid the possibility of a fine. Since collecting a fee to book a unit is a discrete event that occurs on a single day, the Commissioner may issue a Booking Agent a single fine of $300 each time it collects a fee for booking a single unit, but shall not issue any other order that attempts to impose any additional penalty for such booking.   See id.

### 2.   Section 9-14.10(b)

**Section 9-14.10(b)** provides:

> The Commissioner shall enter into agreements with Booking Agents for assistance in enforcing the provisions of this section, including but not limited to an agreement whereby the Booking Agent agrees to remove a listing from its platform for exceeding the maximum number of days a Residential Unit may be offered as a Short-Term Rental, whereby the Booking Agent agrees to remove a listing from its platform that is deemed ineligible for use as a Short-Term Rental under the provisions of this Ordinance, and whereby the Booking Agent agrees to prohibit a host from listing any listing without a valid registration number from the City.

> Any Booking agent that fails to enter into such such agreements to actively prevent, remove or de-list any ineligible listings shall be prohibited from conducting business in the City.

This section directs the Commissioner to enter into an agreement with Booking Agents to assist in enforcement of the Ordinance by removing ineligible unit listings and prohibiting listings without a City registration number.   Id. at §9-14.10.   It states that Booking Agents that fail to

---

[7]   The List is currently somewhat under-inclusive, in that it likely fails to list as "not eligible" certain units that are, in fact, not eligible.

enter into such agreements are prohibited from conducting business in the City, but such language is, admittedly, not self-executing.  Id.  The only substantive requirements that the Commissioner will seek to include in agreements with Booking Agents are the requirements expressly set forth in the Ordinance. See Exhibit D at ¶ 4. Otherwise, he will only seek to include other provisions to clarify implementation timelines, the form of information that parties will exchange, and contact information. Id.

### 3.      Section 9-14.11

Finally, **Section 9-14.11** provides:

> A Booking Agent shall provide to the City, on a monthly basis, an electronic report, in a format determined by the City, in consultation with ISD, DoIT and DND, of the listings maintained, authorized, facilitated or advertised by the Booking Agent within the City of Boston for the applicable reporting period. The report shall include a breakdown of where listings are located, whether the listing is for a room or a whole unit, and shall include the number of nights each unit was reported as occupied during the applicable reporting period.

The City interprets this information sharing provision to require Booking Agents to provide information to the City each month concerning the units located in Boston that were listed on the site in the preceding month.  The Booking Agent must report the unit's location (specifically, the neighborhood within the City, or the precise location when the Airbnb user has consented to publication of this information and Airbnb has published it in the listing), whether the unit's listing was for a room or a whole unit, and the number of nights the unit was reported as occupied during that preceding month.  The regulations promulgated by the Commissioner will describe the format in which Booking Agents shall provide this information to the City.  See Exhibit D.

### C.   Airbnb's Website

#### 1.   Website As Described By Airbnb

Airbnb describes some aspects of its business in its motion seeking a preliminary injunction.  Airbnb operates an Internet website through which people can list and rent housing accommodations.  See Declaration of David Countryman [ECF No. 5] ("Decl.") at ¶ 2.  Airbnb states that it is not a proprietor, owner, or operator of any accommodation offered on its website, and as such does not lease units, is not a party to agreements between guests and hosts, and in general has no right to enter or control over the property.  Decl. at ¶ 7.  Airbnb also states that hosts alone create and are responsible for the content contained in each individual rental advertisement.  Decl. at ¶ 12.  It states that hosts provide unit descriptions, set length of stay, set price, determine when a unit is available, and decide with whom they will enter into rental agreements, Decl. at ¶ 12, that it does not have the right to book or relist any accommodations, and that it does not set rental terms "like security deposits or cleaning fees," Decl. at ¶ 13.  According to Airbnb, although hosts alone are responsible for identifying and complying with local laws, it advises hosts to be aware of local laws.  Decl. at ¶ 14-15.  For hosts considering offering units in Boston, Airbnb's website notes that hosts are required by local law to obtain a business certificate and to comply with zoning.  Decl. at ¶ 17.

#### 2.   Aspects of the Website *Not* Described by Airbnb

There are other features of Airbnb's website and its operation that Airbnb has not described.  Airbnb appears to create some of the content in individual Airbnb listings, providing information to prospective guests about the neighborhood, quality of the unit, the price, or the host.  For example, some Airbnb listings contain notifications that the offered price is a good one, stating that the price is less than the average nightly price or is one of the lowest priced

homes within a mile.  <u>See</u> Sample Listing, attached hereto as <u>Exhibit E(1)</u>.  Other listings state

that that the host "is a Superhost - Superhosts are experienced, highly rated hosts who are

committed to providing great stays for guests."  <u>See</u> Sample Listing, attached hereto as <u>Exhibit</u>

<u>E(2)</u>.  In explaining its Superhost program, Airbnb tells prospective Superhosts that it monitors

their eligibility and adjusts their listings accordingly.  <u>See</u> web page titled "Superhost:

recognizing the best in hospitality," attached hereto as <u>Exhibit E(3)</u> ("Every 3 months, we check

if you meet the following criteria.  If you do, you'll earn or keep your Superhost status.").  Other

listings contain a notification that the unit is "a rare find [that] is usually booked."  <u>See</u> Sample

Listing, attached hereto as <u>Exhibit E(4)</u> ("This is a rare find.  Tes and Sharon's place is usually

booked.").  Some listings also contain neighborhood descriptions that appear to be written by

Airbnb rather than the host.  <u>See</u> Sample Listing, attached hereto as <u>Exhibit E(5)</u>.  All listings

also state a cancellation policy.  <u>See</u> <u>id.</u>

　　　Airbnb has also not fully described who creates and posts the prices in listings.  Airbnb's

website contains a "Smart Pricing" feature, which hosts can turn on to then allow Airbnb to set

the nightly listing price for a unit based on fluctuations in the market and other factors.  <u>See</u>

webpage titled, "How do custom price settings affect my payout amount?," attached hereto as

<u>Exhibit F</u> ("If you've turned on Smart Pricing, your prices will automatically update based on

your minimum price, maximum price and frequency settings.  These settings are determined by

Airbnb's own algorithm and calculations to work towards maximum occupancy of your

listing.").  Although Airbnb states that there were approximately 6,300 active listings for rentals

in Boston on its website, <u>see</u> Decl. at ¶ 18, it has not provided information on how many of those

listings had Smart Pricing enabled, and therefore had prices set by Airbnb.  Airbnb also states

that hosts alone decide with whom and when to transact, and that Airbnb does not have the right

to book or relist any accommodations for any host.  <u>See</u> Decl. at ¶ 7.  This "hands off" description conspicuously omits Airbnb's "Instant Book" feature.  When a host turns on Instant Book, guests can automatically book the unit through Airbnb's website without engaging in any communication with the host and without the host making any decision to rent them.  <u>See</u> webpage titled "What is Instant Book?," attached hereto as <u>Exhibit G</u>.  Again, Airbnb has not described how many of the 6,300 listings in Boston use Instant Book, placing control of critical portions of the listing and booking process in Airbnb's hands.

Additionally, Airbnb's description of listings omits the many terms of each listing that Airbnb itself imposes.  Although the declaration states that "[h]osts set their prices and material terms," and that Airbnb does not set "other terms like security deposits or cleaning fees," there are material terms created by Airbnb and included by reference in any listing. According to the website, hosts listing units are able to choose among three standardized cancellation policies that Airbnb will enforce.  <u>See</u> Cancellation Policies, attached hereto as <u>Exhibit H</u>.  Airbnb provides hosts with insurance of $1,000,000 for property damage and $1,000,000 for liability claims.  <u>See</u> Host Guarantee and Host Protection Insurance, attached hereto as <u>Exhibit I</u>.  A host may not negotiate with a guest for a higher price than in a guest's booking request, nor seek a security deposit after initial booking.  <u>See</u> Terms of Service, attached hereto as <u>Exhibit J</u>, at §§7.1, 7.2. An Airbnb booking dictates that a guest receives a license to enter and use the accommodation for a period and that the host retains the right to re-enter.  <u>Id.</u> at §8.2.  Airbnb has the right to cancel any booking at any time.  <u>Id.</u> at §9.5.  Moreover, all users of the Airbnb platform, including all hosts, are required to accept the "Airbnb Privacy Policy" ("Privacy Policy") when signing up to use the platform.  Decl. at ¶ 5.  The Privacy Policy provides in relevant part, "Airbnb . . . may disclose your information, including personal information to. . . governmental

authorities, if and to the extent we are required or permitted to do so by law." See Airbnb Privacy Policy, attached hereto as Exhibit K, at §3.5.

Finally, Airbnb is not the entity that accepts payment for transactions on its site. Airbnb users contract with Airbnb Payments US, Inc. ("Airbnb Payments US"), not Airbnb, Inc., to process the payments related to transactions on the Airbnb site. See Payments Terms of Service ("Payment Terms"), attached hereto as Exhibit L. The Payment Terms specifically state that payment services are distinct from users' use of the Airbnb platform. Id.

## II.    ARGUMENT

### A.    Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right." Bos. Taxi Owners Ass'n, Inc. v. City of Boston, 84 F. Supp. 3d 72, 77 (D. Mass. 2015) (citation and internal quotations omitted). Therefore, an "injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." Id. at 77-78, quoting Weinberger v. Romero–Barcelo, 456 U.S. 305, 312 (1982). To obtain such relief, the Plaintiff bears the burden of persuasion on the following factors: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm to the movant in the absence of an injunction; (3) the balance of the movant's hardship if relief is denied versus the nonmovant's hardship if relief is granted; and (4) the effect, if any, of the decision on the public interest." The Maine Educ. Assoc. Benefits Trust v. Cioppa, 695 F.3d 145, 152 (1st Cir. 2012).

### B.    Airbnb Has Not Demonstrated That It Is Likely To Succeed On The Merits

Airbnb challenges the validity of three provisions of the Ordinance that apply to Booking Agents. The City will address each provision of the Ordinance separately.

1.      **Section 9-14.9(a)**

Airbnb alleges that Section 9-14.9(a), which permits the City to fine Booking Agents that collect fees for booking ineligible units, is preempted by Section 230 of the Communications Decency Act ("Section 230"). But Airbnb does not have standing to challenge Section 9-14.9(a) and, even if it did, the case law is clear that this section is not preempted by Section 230.

(a)      **Airbnb Lacks Standing.**

Airbnb does not have standing to challenge the provision because it does not collect fees for booking short term rental units. Instead, a separate corporation, Airbnb Payments US accepts fees for booking units listed on the Airbnb website. See Exhibit L. Therefore, it is anticipated that if the City issues fines for violations of Section 9-14.9(a), it would issue such fines to Airbnb Payment US, and not to Airbnb. To have standing, Airbnb must be able to show that: (1) it will suffer an injury in fact to a cognizable interest, (2) "the asserted injury is causally connected" to the Ordinance, and (3) if it succeeds in the litigation, the injury will be redressed. See Pagan v. Calderon, 448 F.3d 16, 27 (1st Cir. 2006). "In addition to these Article III prerequisites, prudential concerns ordinarily require a plaintiff to show that his claim is premised on his own legal rights (as opposed to those of a third party)." Id. (internal citations omitted). Airbnb's claim with respect to Section 9-14.9(a) is premised on the rights of a third party rather than its own rights. Since Airbnb Payments US—and not Airbnb—collects fees and is the likely recipient of any future fine, Airbnb cannot demonstrate that it is likely to suffer an injury-in-fact or that it is not advancing this claim on behalf of another entity's legal rights.

**(b)    Section 230 does not preempt Section 9-14.9(a)'s fine for performing booking services for certain units because it regulates conduct, not online postings.**

Section 230 provides immunity "to entities…that facilitate the speech of others on the Internet." Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 415 (1st Cir. 2007). To that end, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), and "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section," id. at § 230(e)(3). Section 230, therefore, "precludes a state law claim where three criteria are met: '(1) [the entity] is a provider or user of an interactive computer service; (2) the claim is based on 'information provided by another information content provider'; and (3) the claim would treat [the entity] as the publisher or speaker of that information.'" Hiam v. HomeAway.com, Inc., 267 F. Supp. 3d 338, 346 (D. Mass. 2017) (citing Lycos, 478 F.3d at 418).

The City does not dispute that Airbnb is a provider of an "interactive computer service." For the purposes of analyzing Section 9-14.9(a) only, the City also assumes *arguendo* that the information in Airbnb's rental listings is "provided by another information content provider." But Airbnb's Section 230 argument fails in connection with Section 9-14.9(a) because Airbnb is not being treated as the "publisher or speaker of that information." Section 9-14.9(a) does not regulate what can or cannot be said or posted in Airbnb's listings or premise liability on any choices Airbnb makes about how postings work. It creates no obligation on Airbnb to monitor, edit, withdraw, or block the content supplied by hosts, nor does it penalize Airbnb based on anything posted on its site. It operates without regard to what is or is not listed on Airbnb's website. Section 9-14.9(a) holds Airbnb liable only for its own conduct, namely, for accepting

fees for performing booking services for a Short-Term Rental where such unit is not an eligible Residential Unit.[8]  This regulation of Airbnb's own conduct "does not depend on who publishes any information or who is a speaker."  <u>City of Chicago v. StubHub!, Inc.</u>, 624 F.3d 363, 366 (7th Cir. 2010).

Airbnb has advanced this argument before.  Airbnb sought a preliminary injunction against the City of San Francisco for enacting a nearly identical provision that would fine companies that collected a fee to perform booking services for unregistered short-term rental units.  The court rejected the Section 230 claim, concluding that San Francisco's ordinance does not treat Airbnb as the publisher or speaker of rental listings, but "holds plaintiffs liable only for their own conduct, namely for providing, and collecting a fee for, Booking Services in connection with an unregistered unit."  <u>Airbnb, Inc. v. City & Cty. of San Francisco</u>, 217 F. Supp. 3d 1066, 1073 (N.D. Cal. 2016).  In fact, under San Francisco's ordinance, companies like Airbnb remain free to publish any listing - whether for a registered unit or not.  <u>Id.</u>  The court also rejected the idea that because Section 230 shields companies from liability for publishing listings provided by others, it must also shield them from liability for any <u>business</u> they pursue that is connected to those listings. "Section 230," the court reasoned, "does not provide limitless immunity for online activity or conduct related to it.  Congress enacted Section 230 primarily 'to protect websites against the evil of liability for failure to remove offensive content.'"  <u>Id.</u> at 1074 (citing <u>Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC</u>, 521 F.3d 1157, 1174 (9th Cir. 2008)).  The court went on to note that "Section 230[] does not create a general immunity from liability <u>deriving</u> <u>from</u> third-party content."  <u>San Francisco</u>, 217 F. Supp. 3d at 1074 (emphasis added) (internal quotation omitted).  <u>See also</u> <u>Homeaway.com, Inc. v. City of</u>

---

[8]     The City acknowledges that while Section 9-14.9(a) holds Airbnb liable only for its own conduct, and not as a publisher of information provided by third parties, the analysis is different for Section 9-14.10(b) of the Ordinance.

<u>Santa Monica</u>, Case Nos. 2:16-cv-06641-ODW (AFM), 2:16-cv-06645-ODW (AFM), 2018 WL

3013245, at *3 (C.D. Cal. Jun. 14, 2018) (applying same reasoning and rejecting Airbnb's

argument that Section 230 precludes it from being held liable for collecting fees for unregistered

units).   This is because the test is not "whether a challenged activity merely bears some

connection to online content.  It is whether a regulation or claim <u>inherently</u> <u>requires</u> the court to

treat the interactive computer service as a publisher or speaker of information provided by

another." <u>San Francisco</u>, 217 F. Supp. 3d at 1074 (internal quotations omitted).  Here, Section 9-

14.9(a) does not hold Airbnb responsible as the publisher or speaker of listings that appear on its

site; rather, it holds Airbnb responsible for its own conduct facilitating illegal transactions.  As a

result, Section 9-14.9(a) is not preempted by Section 230.

Airbnb's reliance on <u>Jane Doe No. 1 v. Backpage.com, LLC</u>, 817 F.3d 12 (1st Cir. 2016),

is similarly misplaced. In that case, three young women who claimed to have been victims of sex

trafficking brought suit against Backpage.com, the website that published the advertisements for

their "escort" services. <u>Id.</u> at 16.  The complaint alleged that Backpage.com made a number of

choices for operating its website that were intended to make sex trafficking easier, like accepting

anonymous payments for advertisements, allowing people to post ads after attempting to enter

forbidden terms, and stripping metadata from pictures in advertisements. <u>Id.</u> at 20.  The First

Circuit explained that these particular types of choices about the design and operation of

Backpage.com constituted general choices about how to treat listings and therefore were

publishing activities entitled to Section 230 protection. <u>Id.</u> at 20-21 (citing <u>Lycos</u>, 478 F.3d at

422) ("decision not to reduce misinformation by changing its web policies was as much an

editorial decision with respect to that misinformation as a decision not to delete a particular

posting.").  The First Circuit held that the plaintiffs' claims against Backpage treated it as a

publisher when they "address[ed] the structure and operation of Backpage's website, that is, Backpage's decisions about how to treat postings." 817 F.3d at 21 (emphasis added). The features that the plaintiffs pointed to, the First Circuit explained, "reflect choices about what content can appear on the website and in what form," and these "are editorial choices that fall within the purview of traditional publisher functions." Id.

The First Circuit's holdings in Lycos and Backpage only protect website construction and operation to the extent that such features reflect general decisions about what gets posted, which makes them "editorial choices that fall within the purview of traditional publisher functions" protected by Section 230. Backpage, 817 F.3d at 21. That language and reasoning does not extend to Airbnb's booking services just because it "designed" its website to also provide payment processing services. After all, the First Circuit did not hold that Backpage.com was free to process payments for underage "escorts" for a fee just because Section 230 immunized it from liability for the listings that led to those illegal transactions. Section 9.14-9(a) of the Ordinance does not regulate any part of the design or construction of Airbnb's website that reflects choices regarding what content can appear on the website or in what form. It simply regulates Airbnb's ability to perform the separate act of providing booking services and collecting a fee for doing so—which is entirely distinct from the publishing activity described in Backpage. Indeed, the business of managing listings and the business of collecting fees to book units are distinct enough that in Airbnb's case they are performed by two completely separate legal entities.

Even though collecting fees for booking ineligible units is not publishing activity (under even the broadest definition), Airbnb argues that Section 230 should still preempt Section 9-14.9(a). Although Section 9-14.9(a) does not require Airbnb to do anything with regards to its listings, Airbnb asserts that it will force Airbnb to "monitor, review, and remove third-party

content from its website," and argues that "when conducting a preemption analysis, courts must examine the real-world operation and effect of state and local laws."  See Pl.'s Mem. at 15 (emphasis added).   Relying on National Meat Ass'n v. Harris, 565 U.S. 452, 464 (2012), it argues that any regulation of its non-publishing booking business that may affect its publishing business must also be preempted by Section 230.  This argument fails for two reasons:  National Meat does not support this argument for preemption in this context; and, more importantly, Section 9-14.9(a) does not force Airbnb to monitor and remove listings.

In National Meat, the Supreme Court struck down a California law that imposed criminal penalties on slaughterhouses for selling products from nonambulatory animals for human consumption.  Id. at 464.  Slaughterhouses are comprehensively regulated at the federal level by the U.S. Department of Agriculture Food Safety Inspection Services ("FSIS") under 21 U.S.C. s. 601 (the "FMIA") and FSIS has issued extensive regulations pursuant to the FMIA.  Id. at 456. That extensive regulatory scheme includes rules concerning the humane slaughter of animals, and in the year prior to litigation the FSIS employed about 9,000 people to implement and enforce its humane handling requirements, carrying out more than 126,000 "humane handling verification procedures."  Id. The FMIA contains an express preemption provision that is significantly different than the language of Section 230, providing: "[r]equirements within the scope of this [Act] with respect to premises, facilities and operations of any establishment at which inspection is provided under . . . this [Act] which are in addition to, or different than those made under this [Act] may not be imposed by any State." 21 U.S.C. § 678.3.  The language of that preemption clause, according to the Court, "sweeps widely. . . [and] prevents a state from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act and concern a slaughterhouse's facilities or operations."  Id. at 459-460. The

state sales rule imposed a "different" rule, the Court held, because it criminalized the sale of meat that was slaughtered in a manner specifically permitted under the federal regulatory scheme. Id. at 464.

The Court's holding in National Meat, however, does not somehow rewrite the very different language of Section 230 to now preempt state or local regulation of any stage of the online rental process. National Meat involved a highly regulated industry with an exhaustive regulatory and inspection regime, and a preemption clause intended to protect FMIA's comprehensive reach. Section 230, by contrast, does not involve preemption of state laws that interfere with some comprehensive federal regulatory scheme for the housing rental (or any other) business. Instead, it insulates interactive computer services only to the extent laws treat them as the publisher of content posted by a third party. The preemption language in Section 230, stating that "no cause of action . . . and no liability may be imposed under any state or local law that is inconsistent with this section" is similarly limited to "publisher" activity. See 47 U.S.C. § 230(e)(3). Airbnb has thus failed to show how Section 230 indicates a congressional intent to protect a company that embarks on the business of performing payment processing for illegal transactions. Airbnb's argument would necessarily lead this Court away from the language of Section 230 and the analysis demanded by Lycos and Backpage—whether a claim is based on information provided by a third party and whether an interactive computer service is the "publisher" of such information. This is exactly the conclusion that the San Francisco court reached when Airbnb claimed that National Meat meant that San Francisco could not regulate its booking activities: "courts that have construed National Meat in contexts outside the FMIA have limited it to its particular facts[,]" San Francisco, 217 F. Supp. 3d at 1075, and courts have been reluctant to view every ordinance that has the effect of causing a business to change its practices

as subject to preemption under the holding in <u>National Meat</u>, <u>see also</u> <u>U.S. Smokeless Tobacco</u> <u>Mfg. Co. LLC v. City of New York</u>, 708 F.3d 428, 434 (2d Cir. 2013) (declining to apply <u>National Meat</u> to justify preemption of local ordinance regulating sale of certain tobacco products because "it does not follow that every sales ban . . . should be regarded as a backdoor attempt" to regulate conduct upstream). Where a regulation does not operate against a company as a publisher, there is no place to conclude that it is still preempted by Section 230.

Moreover, and perhaps more importantly, Section 9-14.9(a) does not compel Airbnb to do anything to its listing, much less monitor and remove them.  In order to avoid being fined for collecting fees for booking units that are not eligible, Airbnb might, as it suggests, choose to monitor and remove certain listings from its website. Alternatively, it might simply decline to process transactions for units that are not eligible, charge fees for publishing listings as opposed to facilitating transactions, or simply place the responsibility for posting an ineligible unit on hosts by requiring them to indemnify Airbnb (which Airbnb already does).  Airbnb is free to choose any method it prefers; Section 9-14.9(a) does not <u>require</u> it to monitor or remove listings, nor inexorably lead it to do so.

> **(c)   Section 9-14.9(a) does not implicate the First Amendment because it does not regulate the freedom of expression and, even if it did, the First Amendment does not protect illegal conduct.**

Finally, Airbnb argues that Section 9-14.9(a) violates the First Amendment because it imposes a "financial burden on speakers because of the content of their speech."  <u>See</u> Pl.'s Mem. at 19.  This argument fails because the First Amendment does not concern itself with economic impact but, rather, with "the effect of [the challenged] ordinance upon freedom of <u>expression</u>." <u>Young v. Am. Mini Theatres, Inc.</u>, 427 U.S. 50, 78 (1976) (Powell, J., concurring) (emphasis

added).   Here, Section 9-14.9(a) does not regulate the freedom of expression.   It regulates business conduct.  So the First Amendment is not implicated at all.

"The initial inquiry under the First Amendment is whether the Ordinance primarily targets speech or speakers, or is better construed as an economic regulation."  San Francisco, 217 F. Supp. 3d at 1076.   "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct," and "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."  Sorrell v. IMS Health Inc., 564 U.S. 552, 567 (2011).  Section 9-14.9(a) is directed only at Airbnb's non-expressive conduct.  It fines any person or Booking Agent who accepts a fee for booking a unit that is not eligible as a Short-Term Rental.  As noted by the court in San Francisco, this type of conduct "is a business transaction to secure a rental, not conduct with a significant expressive element."  217 F. Supp. 3d at 1076 (citing Int'l Franchise Ass'n, Inc. v. City of Seattle, 803 F.3d 389, 408 (9th Cir. 2015) ("decision of a franchisor and a franchisee to form a business relationship and their resulting business activities" not expressive conduct). Because Section 9-14.9(a) does not regulate any expressive conduct of Airbnb, the First Amendment is not implicated.

However, even if this Court were to find that imposing a fine against a Booking Agent who accepts a fee for a unit that is not eligible as a Short-Term Rental does amount to a regulation on expressive conduct, Airbnb's First Amendment argument still fails because the First Amendment does not protect offers to engage in unlawful conduct.  See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 388-89 (1973) ("Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether

absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity"). Section 9-14.9(a) only penalizes Booking Agents like Airbnb when they collect a fee for an illegal unit.  As noted by the court in <u>Santa Monica</u>, Airbnb "cannot use the First Amendment as a shield to allow them to communicate offers to rent illegal units."  <u>See Santa Monica</u>, 2018 WL 3013245, at *6 (citing <u>San Francisco</u>, 217 F. Supp. 3d at 1079).

In an attempt to get around the First Amendment's lack of application to illegal activity, Airbnb argues that the First Amendment nonetheless protects advertisements that do not "on their face" invite illegal activity, and it cites <u>Braun v. Soldier of Fortune Magazine, Inc.</u>, 968 F.2d 1110, 1117-19 (11th Cir. 1992) to support its position.  As also noted by the court in <u>Santa Monica</u>, though, <u>Braun</u> does not stand for this proposition.  <u>See Santa Monica</u>, 2018 WL 3013245, at *6.  "In <u>Braun</u>, the court simply found that under the Georgia negligence standard it may be appropriate to impose tort liability on a publisher when an advertisement 'on its face' clearly made it apparent that there was a substantial risk to the public;" it did <u>not</u> hold, as Airbnb contends, that the First Amendment protected advertisement of illegal conduct unless the illegality appeared "on its face."  <u>Id.</u>  (internal citation omitted).  The <u>Santa Monica</u> court went on to note, in denying Airbnb's motion for a preliminary injunction on First Amendment grounds, that "[i]t is well-settled that the First Amendment does not protect commercial speech related to illegal activity[.]"  <u>Id.</u> (citing <u>San Francisco</u>, 217 F. Supp. 3d at 1117) (internal citations and quotations omitted).  Moreover, in case there was any doubt as to whether the advertisements are illegal on their face, the Ordinance provides clarity:  where an advertisement does not include a registration number, it is illegal.  Because Section 9-14.9(a) only penalizes

Booking Agents like Airbnb for collecting a fee for an illegal unit, it does not implicate the First Amendment.

### 2. Section 9-14.10(b)

Airbnb challenges Section 9-14.10(b), which directs the Commissioner to enter into agreements with Booking Agents that include requirements that Booking Agents that run listing websites remove listings for ineligible units, and prohibit hosts from posting listings without a City registration number. See Exhibit A. It also states that Booking Agents that fail to enter into such agreements are prohibited from conducting business in the City. Id. Although Section 9-14.10(b) regulates listings that appear on Airbnb's website, Airbnb is not entitled to a preliminary injunction on Section 230 grounds because it has not demonstrated that the Ordinance acts on third-party content. Further, it is not entitled to a preliminary injunction based on the purported vagueness of Section 9-14.10(b) because the City commits to a permissibly constrained interpretation of its authority under the Ordinance.

#### (a) Airbnb has not demonstrated that the listings on its website are third-party content protected by Section 230.

As noted in Section II(B)(1)(b) above, in order to seek shelter under Section 230, Airbnb must show that it is being treated as the publisher of "information provided by another information content provider." See Hiam, 267 F. Supp. 3d at 346 (emphasis added). Although Section 9-14.10(b) treats Airbnb as the publisher of listings on its website, Airbnb has not demonstrated, at this stage, that the listings are content created by "another" information provider, rather than something created in part by Airbnb.

Airbnb alleges that listings on its site constitute "information provided by another information content provider." To support this, Airbnb states that it is not a proprietor, owner, or operator of units offered on its website, that it is not a party to agreements between guests and

hosts, and that it, in general, has no right to enter or control the property.  Airbnb also states that hosts alone create the content of rental advertisements, including unit descriptions, availability, and price.  Airbnb asserts that it does not decide who hosts will rent to, that it does not have the right to book units, and does not set rental terms.  If that description of the site was complete, the listings would seem to be the type of postings that the First Circuit has previously recognized as falling within the scope of Section 230.

However, Airbnb's description of its listings is incomplete.  Many Airbnb listings contain content that appears to be created by Airbnb and not the host. For example, listings contain notifications that units are listed for a good price, are rarely available, or are offered by "Superhosts" who provide experience and great service.  See Exhibits E(1)-E(3).  An unknown number of listings may also have material terms of the rental transaction set by Airbnb itself.  Although Airbnb asserts that hosts determine the prices, it has not described its Smart Pricing feature which sets prices for units, or revealed how many units in Boston are listed this way.  See Exhibit F.  Similarly, despite stating that hosts decide who to rent to, Airbnb has not described its Instant Book feature which allows the website to book listings without any communication or separate agreement between host and guest.  See Exhibit G.  Again, Airbnb has not described how many units in Boston are listed and booked this way.  Finally, Airbnb has failed to describe the many terms that Airbnb itself imposes on each listing.  For example, Airbnb dictates one of three cancellation policies for the agreement, provides insurance for property damage and liability claims, forbids the imposition of unlisted fees, dictates that the rental is a "license" rather than a lease, and retains the right to cancel any booking at any time despite the fact that it claims not to be a party to the agreements.  See Exhibit H. These and other terms dictated by Airbnb are incorporated into each listing.

In other words, Airbnb might be more of a partner in creating listings than a bulletin board where other people post their content. Airbnb fails to fully describe those aspects of its website, particularly how and how often it creates content in Boston listings.  It has thus failed to demonstrate that the listings on its website for units in Boston are actually information provided by another information content provider. Therefore, it has not demonstrated that is likely to succeed on the merits of its claim that Section 9-14.10(b) cannot be enforced pursuant to Section 230.

**(b)    The City will not implement the agreements in a manner that violates the Due Process Clause of the U.S. Constitution or Art. 12 of the Massachusetts Declaration of Rights.**

Airbnb claims that the Ordinance violates due process because it is vague and does not limit the enforcing authority's discretion.  Pl.'s Mem. at 23, citing Grenier v. Board of Selectmen of Shrewsbury, 80 Mass. App. Ct. 460, 461-464 (2011).  In particular, it argues that Section 9-14.10(b) is impermissibly vague because it requires Booking Agents to enter agreements "including but not limited to" specified content removal provisions, so Airbnb does not know what else the City might require under that provision. This claim is premature, but to provide clarity the City concedes that Section 9-14.10(b) does not authorize it to impose substantive requirements on Booking Agents other than those expressly set forth in the Ordinance. The Commissioner, who is charged with implementing Section 9-14.10(b), interprets it in a limited manner and will only seek to enter into agreements that: (1) require Booking Agents to remove a listing if the City informs the Booking Agent that it has deemed the unit ineligible; and (2) require Booking Agents to prohibit Operators from posting listings for units in Boston that do not display a valid City of Boston registration number.  See Exhibit D at ¶ 4. The Commissioner interprets the "including but not limited to" language simply as permitting

the inclusion of other contract provisions that will facilitate the implementation of the requirements, such as definitions, implementation timelines, and provisions concerning the form in which parties will exchange information.  See id.  Therefore, Section 9-14.10(b) will not subject Airbnb to the prospect of unknown and standardless additional regulation.

> **(c)** **Section 9-14.10(b) does not implicate the First Amendment because the First Amendment does not protect speech advertising illegal activity.**

Airbnb also argues that Section 9-14.10(b) violates the First Amendment because it, in effect, chills Airbnb's speech.  Assuming, arguendo, for purposes of this section only, that Section 9.14.10(b) attempts to regulate Airbnb's speech at all, as noted in Section II(B)(1)(c) above, the First Amendment does not apply to speech advertising illegal conduct. See Pittsburgh Press Co., 413 U.S. at 388-89.  Because Section 9-14.10(b) only requires Airbnb to remove illegal listings, it does not implicate the First Amendment.

> **3.** **Section 9-14.11**

> **(a)** **Airbnb fails to demonstrate that Section 9-14.11 will violate the Stored Communications Act.**

The Stored Communications Act ("SCA") provides a set of rules limiting when a provider of electronic communication service ("ECS") or remote computing service ("RCS") may provide information or records pertaining to a customer to the government, 18 U.S.C. § 2702(a)(3), or be required to do so by the government, 18 U.S.C. § 2703(c).[9]  Airbnb is not likely to prevail on its claim that the Ordinance violates the SCA because the information requested does not pertain to customers, the customers have consented to disclosure of the information, and the information is already public.

---

[9] The City of Boston does not dispute that Airbnb may be either an ECS or RCS provider, but asserts that this fact is irrelevant to whether the information required by Section 9-14.11 may be disclosed.

**(1)** **The Stored Communications Act does not prohibit disclosures required by Section 9-14.11 because required information is not pertaining to a subscriber or customer.**

The Ordinance does not violate the SCA, as the SCA only prevents disclosure of information "pertaining to a subscriber [] or customer."  The information requested by the Ordinance pertains to <u>listings</u> that are maintained, authorized, facilitated or advertised by Airbnb, not to Airbnb's customers themselves.

Airbnb repeatedly cites to <u>Telecommunications Regulatory Bd. of Puerto Rico v. CTIA-Wireless Ass'n</u>, 752 F.3d 60 (1st Cir. 2014), in support of its argument.  There, the court held that a law passed by the government of Puerto Rico was preempted by the SCA, as it required communications providers to report basic subscriber information of purchasers of prepaid phones, including their names, addresses, and phone numbers, to the government without a subpoena. <u>See</u> <u>CTIA-Wireless</u>, 752 F.3d at 68.  Airbnb argues that Section 9-14.11 "puts Airbnb in precisely the same position as the providers in <u>CTIA-Wireless</u>."  Pl.'s Mem. at 27.

Yet, the circumstances are readily distinguishable.  Unlike in <u>CTIA-Wireless</u>, where the sellers of prepaid phones were required to provide detailed information regarding their customers, the Ordinance does not require Booking Agents provide <u>any</u> information whatsoever regarding the platform's users.  Instead, the Ordinance requests information regarding <u>listings</u> on the Airbnb platform, without information tying the listing to a particular subscriber.  It does not request user name, address, or contact information, as the court found objectionable in <u>CTIA-Wireless</u>.  Airbnb itself recognizes this distinction between user information and listing information.  When discussing what information is made available to the general public in its Privacy Policy, Airbnb has one bulleted paragraph regarding what information of the user's profile is public ("your public profile page, such as your first name, your description, and city"),

separate from a second bulleted paragraph regarding the listings themselves ("[l]isting pages are publicly visible and include information such as the Accommodation['s] . . . approximate location". . . ). See Exhibit K at §3.3. Given this distinction, Section 9.14-11 should not be found to violate the SCA, as the information it requires Airbnb to disclose does not fall within the SCA's protections.

> **(2)      The Stored Communications Act explicitly allows the disclosure of information requested by Section 9-14.11, as all Airbnb customers have given consent to this disclosure.**

The SCA provides numerous exceptions to its general constraints regarding information sharing. See 18 U.S.C. §§ 2702(c), 2703(c).   Airbnb conclusorily states that "none of [the enumerated exceptions] applies here," Pl.'s Mem. at 25, but provides no further reasoning, other than later asserting that "the government cannot obtain information from a provider, like Airbnb, without providing some form of legal process," Pl.'s Mem. at  26.   Both statements are incorrect. Assuming, arguendo, that the information requested by Section 9.14.11 is deemed "pertaining to a subscriber [ ] or customer," the SCA still does not prohibit its disclosure, as the disclosure falls within the explicit carve-out from the SCA's protection for user consent.   18 U.S.C. § 2703(c) ("A governmental entity may require a provider of [ECS] or [RCS] to disclose a record or other information pertaining to a subscriber [ ] or customer . . . when the governmental entity . . . (C) has the consent of the subscriber or customer to such disclosure."); see also 18 U.S.C. § 2702(c)(2) ("A provider [of ECS or RCS] may divulge a record or other information pertaining to a subscriber [ ] or customer . . . with the lawful consent of the customer or subscriber. . .").

When signing up to use the Airbnb platform, all users, including all hosts, are required to accept the Airbnb Privacy Policy.   Decl. at ¶ 5.   The Privacy Policy provides that "Airbnb. . . may disclose your information, including personal information to .  .  . governmental authorities,

or authorized third parties, if and to the extent we are required or permitted to do so by law or if such disclosure is reasonably necessary . . . to comply with our legal obligations."  See Exhibit K at §3.5.  By their acceptance of the Privacy Policy, Airbnb's users have consented to the disclosure of their information to governmental authorities when required by law.  To the extent that the information requested from Airbnb by the Ordinance can be deemed "information pertaining to a subscriber [ ] or customer," Airbnb has failed to provide any reasoning as to why acceptance of its own Privacy Policy is not sufficient consent to satisfy the SCA.

In a recent decision regarding a New York City ordinance requiring Airbnb to disclose certain customer data to the municipality, the United States District Court for the Southern District of New York agreed.  The court stated that Airbnb's privacy policies "appear themselves to establish effective user consent to the possibility that information will be disclosed to governmental entities."  Airbnb v. City of New York, Nos. 18 Civ. 7712, 18 Civ. 7742, 2019 WL 91990 at *44 (S.D.N.Y. Jan. 3, 2019), attached to Pl. Notice of Supplemental Auth. (CM/ECF Document # 22).  As a result, the court wrote it was "not prepared to conclude that plaintiffs are likely to succeed on the merits of this claim [that the ordinance was preempted by the SCA]."  Id. at *41.  This court should follow the same reasoning and find that Airbnb is unlikely to prevail on the merits of its argument that Section 9-14.11 of the Ordinance violates the SCA.

**(3)     The Stored Communications Act does not protect communications or records that are readily accessible to the public.**

Assuming, arguendo, that Airbnb's users had not given consent to disclosure of the information required by Section 9-14.11, Airbnb's disclosure of the information still does not violate the SCA, as the SCA does not protect information that is readily accessible to the general public. 18 U.S.C. § 2511(2)(g)(i); Snow v. DirecTV, Inc., 450 F.3d 1314, 1321 (11th Cir. 2006) ("the requirement that the electronic communication not be readily accessible by the general

public is material and essential to recovery under the SCA"); see also Ehling v. Monmouth-Ocean Hosp. Serv. Corp., 961 F. Supp. 2d 659, 667 (D.N.J. 2013) ("The touchstone of the [legislation containing the SCA] is that it protects private information.") (emphasis added).

Section 9-14.11 requires Airbnb to provide a limited subset of information that Airbnb collects regarding its listings, specifically, "where the listings are located, whether the listing is for a room or a whole unit, and . . .  the number of nights each unit was reported as occupied." Airbnb warns its users in the Privacy Policy that numerous pieces of information they provide to Airbnb are available to the general public, including "the Accommodation or Experience's approximate location (neighborhood and city) or precise location (where you have provided your consent), Listing description, [and] calendar availability."  See Exhibit K at §3.3.  These pieces of public information are in parallel to the information requested by Section 9-14.11.[10]  As this information is already accessible to the general public, the City contends it may request its disclosure per Section 9-14.11 without running afoul of the SCA; the SCA simply does not apply.

> **(b)** **Airbnb fails to demonstrate Section 9.14-11 violates the Fourth Amendment or Art. 14 of the Massachusetts Declaration of Rights, as Airbnb has no reasonable expectation of privacy in the records at issue.**

Airbnb asserts that Section 9-14.11 is unconstitutional because it requires Airbnb to "disclose its business records without opportunity for precompliance review," as it claims is required under the Fourth Amendment and Art. 14 of the Massachusetts Declaration of Rights. Pl.'s Mem. at 28. While the Supreme Court has afforded Fourth Amendment protection to some business records, see City of Los Angeles, Calif. v. Patel, 135 S. Ct. 2443, 2452 (2015), the

---

[10] The City acknowledges that "number of nights each unit was reported as occupied," Section 9-14.11, may not be precisely equivalent to "calendar availability," Exhibit K at §3.3, but contends that this information renders the "number of nights . . . occupied" ascertainable, and thus, public.

Court has also made clear that the Fourth Amendment's protections extend only to <u>private</u> records.  <u>See</u> <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); <u>see also</u> <u>United States v. Gines-Perez</u>, 214 F. Supp. 2d 205, 225 (D.P.R. 2002) ("it strikes the Court as obvious that a claim to privacy is unavailable to someone who places information on an indisputably, public medium, such as the Internet, without taking any measures to protect the information."); <u>Patel v. City of Los Angeles</u>, 738 F.3d 1058, 1062 (9th Cir. 2013), <u>aff'd sub nom.</u> <u>Patel</u>, 135 S. Ct. 2443 (2015) (stating publicly accessible hotel records would not be protected by the Fourth Amendment).

Airbnb also attempts to argue that Section 9-14.11 violates Art. 14 of the Massachusetts Declaration of Rights, pointing to Massachusetts case law supporting the contention that Art. 14 has "more stringent requirements" than the Fourth Amendment.  Pl.'s Mem. at 29.  These more stringent requirements are irrelevant, however, because that same case law states that the requirements of Art. 14 are triggered, like those of the Fourth Amendment, when the government "intrudes on a person's reasonable expectation of privacy."  <u>Commonwealth v. Augustine</u>, 467 Mass. 230, 241-242 (2014).  Airbnb is unable to demonstrate <u>any</u> expectation of privacy in information required by Section 9-14.11, much less a reasonable one.

The information requested by Section 9-14.11 is already "expose[d] to the public," and thus, not protected by the Fourth Amendment, nor by Art. 14.  As detailed above in Section II.B(3)(a)(3) and footnote 10, Airbnb concedes in its Privacy Policy that numerous pieces of information regarding listings are available to the general public, including "the Accommodation or Experience's approximate location (neighborhood and city) or precise location (where you have provided your consent)" (compare Section 9-14.11 request for "where the unit is located"),

"[l]isting description" (compare Section 9-14.11 request for "whether listing is for a room or a whole unit"), and "calendar availability" (compare Section 9-14.11 request for "number of nights each unit was reported as occupied").  See Exhibit K at §3.3.  As a result of the explicitly public nature of this information, Airbnb cannot demonstrate any reasonable expectation of privacy in it, for purposes of either the Fourth Amendment or Art. 14. Without any expectation of privacy, Airbnb cannot deny the City's request for information pursuant to Section 9-14.11 under the guise of protecting federal and state constitutional privacy rights.

### C.    Airbnb Will Not Be Irreparably Harmed If the Court Denies Its Request for a Preliminary Injunction, In Whole or In Part

Airbnb has identified three purported irreparable harms it will face unless the Court grants it a preliminary injunction: the threat of significant penalties, the loss of First Amendment freedoms, and damage to consumer goodwill.

Airbnb has not demonstrated that Section 9-14.9(a)'s fine for businesses that collect a booking fee for certain units will cause it irreparable or significant harm in any of those ways. Airbnb faces the prospect of a $300 fine only when it collects a fee to conduct booking services for a unit that is listed as "not eligible" on the Short-Term Eligibility List.  However, Airbnb has not provided any information about the frequency with which it collects fees for booking units that are not eligible in Boston, so even if the City issues fines during this litigation, there is no basis upon which the Court can conclude those fines would be substantial.  Moreover, even if it is fined during this litigation, Airbnb will not be irreparably harmed.  If Airbnb prevails in its claims with respect to Section 9-14.9(a), any fines it (or Airbnb Payments US) paid to the City under that provision will be refunded.  Also, Airbnb's Terms of Service require hosts to indemnify Airbnb and Airbnb Payments US for any damages and losses "arising out of or in any way connected with . . . [the host's] breach of any laws [or] regulations."  See Exhibit J at §18.

Win or lose, Airbnb is protected, and it cannot demonstrate that absent an injunction against Section 9-14.9(a) it will be irreparably harmed, or that any harm will be substantial.  Section 9-14.9(a) does not pose any potential loss of First Amendment freedoms because it operates solely based on conducting certain financial services, and does not operate based upon speech, nor require Airbnb or its customers to post or not post anything.  Finally, Airbnb has not explained how it being fined for conducting financial services for prohibited rentals would hurt consumer goodwill, nor how sharing information with the City that its users willingly consented to publicly publishing on the Airbnb website would hurt consumer goodwill.

### D.      The Balance Of Hardship and Public Interest Favor the City

The balance of hardship decisively favors the City.  As demonstrated above, if Airbnb must comply with the provisions of the Ordinance it challenges, it will not suffer constitutional injury, irrecoverable civil penalties, or loss of goodwill.  In sharp contrast, should the court enjoin enforcement of the challenged provisions of the Ordinance, Booking Agents like Airbnb could continue to facilitate thousands of illegal transactions during the pendency of this lawsuit, actively facilitating the short-term rental of ineligible units and contributing to the impression that illegal units continue to be legally available to customers and causing confusion in the event that the City is ultimately successful on the merits.  Additionally, and most importantly, allowing Airbnb to continue to accept fees for booking illegal units will have the detrimental effect of continuing to encourage the unavailability and unaffordability of permanent housing stock in Boston—the important public problem that the Ordinance seeks to remedy.  See Exhibit B.  The public interest favors enforcement of the Ordinance's provisions regarding Booking Agents, because while the City may be able to enforce other portions of the Ordinance against hosts, the

public interest is strongly served by preventing third-parties from actively facilitating illegal transactions without consequence.

III.     **CONCLUSION**

WHEREFORE, for the foregoing reasons, the Court should deny Plaintiff's motion for a preliminary injunction in its entirety.  However, in the event that the Court determines that Plaintiff is entitled to a preliminary injunction because a particular provision (or portion) of the Ordinance is likely invalid, it should limit any injunction to operate only against the specific provision of the Ordinance against which that Airbnb has demonstrated it is entitled to an injunction.

Respectfully submitted:

DEFENDANT, CITY OF BOSTON

By its attorneys:

Eugene L. O'Flaherty
Corporation Counsel


/s/ Nicole M. O'Connor
Adam Cederbaum (BBO#661549)
Chief of Government Services
Nicole M. O'Connor (BBO#675535)
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4030 (Cederbaum)
(617) 635-4039 (O'Connor)
Adam.Cederbaum@boston.gov
Nicole.Oconnor@boston.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Nicole M. O'Connor, hereby certify that I served a true copy of the above document upon all parties of record via this court's electronic filing system and upon those non-registered participants via first class mail.


<u>Date</u>:  February 8, 2019                    /s/ Nicole M. O'Connor
                                                 Nicole M. O'Connor