UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| AIRBNB, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:18-cv-12358-LTS |
| | ) | |
| | ) | |
| CITY OF BOSTON, | ) | |
| | ) | |
| Defendant. | ) | |

_____

## REPLY IN SUPPORT OF PLAINTIFF AIRBNB, INC.'S MOTION FOR PRELIMINARY INJUNCTION

Chad Golder (*Pro hac vice*)
Adele M. El-Khouri (*Pro hac vice*)
MUNGER, TOLLES & OLSON LLP
1155 F Street NW, 7th Floor
Washington, DC 20004-1361
Tel: (202) 220-1100
Fax: (202) 220-2300

Jonathan H. Blavin (*Pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-4000
Tel: (415) 512-4000
Fax: (415) 512-4077

Howard M. Cooper (BBO #543842)
Christian G. Kiely (BBO #684308)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel: (617) 720-2626
Fax: (617) 227-5777

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   AIRBNB IS LIKELY TO SUCCEED ON THE MERITS.................................................2

    A.    The CDA Preempts the Ordinance ..........................................................2

        1.    Section 9-14.10(b) compels Airbnb to remove content and Airbnb is not an "information content provider"..............................................................2

        2.    Section 9-14.10(a) impermissibly requires Airbnb to engage in content policing and regulates the design and structure of Airbnb's website ....................5

            (a)    Airbnb, Inc. has standing to challenge Section 9-14.10(a) ........................5

            (b)    The CDA Preempts Section 9-14.10(a) ...........................................6

                (i)    Section 9-14.10(a) Compels Content Removal .............................6

                (ii)    Section 9-14.10(a) Compels Content Monitoring...........................8

                (iii)    The City cannot distinguish controlling Circuit precedent protecting a site's "design and operation" ......................................9

                (iv)    *San Francisco* and *Santa Monica* Are Distinguishable, Wrongly-Decided Outliers............................................................10

        3.    Section 9-14.10 is obstacle preempted.................................................12

    B.    The Ordinance Violates the First Amendment and Article 16 .............................12

        1.    Section 9-14.10(b) applies to speech that is lawful on its face.............................12

        2.    Section 9-14.10(a) imposes a financial burden on speech....................................13

    C.    The Ordinance Violates the Due Process Clause and Article 12...........................14

    D.    Section 9-14.11 Violates the Fourth Amendment and Article 14.........................14

    E.    Section 9-14.11 Violates the SCA ........................................................17

III.   THE OTHER PRELIMINARY RELIEF FACTORS SUPPORT AIRBNB...................19

IV.   CONCLUSION...................................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Advanced Nano Coatings, Inc. v. Hanafin,*
   478 F. App'x 838 (5th Cir. 2012) ............................................................6

*Airbnb, Inc. v. City and County of San Francisco,*
   217 F. Supp. 3d 1066 (N.D. Cal. 2016) ................................8, 10, 11, 13

*Airbnb, Inc. v. City of New York,*
   __ F. Supp. 2d __, 2019 WL 91990 (S.D.N.Y. Jan. 3, 2019) ........................................ passim

*Braun v. Soldier of Fortune Magazine,*
   968 F.2d 1110 (11th Cir. 1992) ........................................................12, 13

*Carafano v. Metrosplash.com, Inc.,*
   339 F.3d 1119 (9th Cir. 2003) ...............................................................3

*City of Los Angeles v. Patel,*
   135 S. Ct. 2443 (2015).......................................................................14, 15

*Coons v. Industrial Knife Co.,*
   620 F.3d 38 (1st Cir. 2010)...................................................................12

*Dalton v. Honda Motor Co., Ltd.,*
   425 F. App'x 886 (Fed. Cir. 2011) .........................................................6

*Demarest v. Manspeaker,*
   498 U.S. 184 (1991)..............................................................................14

*Doe v. Internet Brands, Inc.,*
   824 F.3d 846 (9th Cir. 2016) .................................................................8

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,*
   521 F.3d 1157 (9th Cir. 2008) ........................................................3, 4, 9

*Franchise Tax Bd. of California v. Alcan Aluminium Ltd.,*
   493 U.S. 331 (1990)............................................................................5, 6

*Freedman v. Am. Online, Inc.,*
   303 F. Supp. 2d 121 (D. Conn. 2004).................................................19

*Garrett v. City of Escondido,*
   465 F. Supp. 2d 1043 (S.D. Cal. 2006)................................................14

*George v. National Water Main Cleaning Co.,*
   2013 WL 5205846 (D. Mass. Sept. 16, 2013) .....................................17

**TABLE OF AUTHORITIES**
(Continued)

Page

*Grafton and Upton R.R. Co. v. Town of Milford*,
   337 F. Supp. 2d 233 (D. Mass. 2004) ...................................................................................20

*Homeaway.com, Inc. v. City of Santa Monica*,
   2018 WL 3013245 (C.D. Cal. June 14, 2018), appeal docketed, No. 18-55805
   (9th Cir. June 19, 2018) ...................................................................................10, 11, 12

*HomeAway.com, Inc. v. City of Portland*,
   No. 3:17-cv-00091-MO (D. Or. Feb. 27, 2017).................................................................17

*Jane Doe No. 1 v. Backpage.com, LLC*,
   817 F.3d 12 (1st Cir. 2016).................................................................8, 9, 10, 11

*Jones v. Dirty World Entm't Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) ...................................................................................3

*Jones v. Rath Packing Co.*,
   430 U.S. 519 (1977).................................................................................................7

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) ...................................................................................5

*La Park La Brea A LLC v. Airbnb, Inc.*,
   285 F. Supp. 3d 1097 (C.D. Cal. 2017) ....................................................... passim

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ...................................................................................20

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)..............................................................................................19

*National Meat Ass'n v. Harris*,
   565 U.S. 452 (2012)..............................................................................................8

*New York State Comm'n on Cable Television v. FCC*,
   669 F.2d 58 (2d Cir. 1982)......................................................................................7

*Patel v. City of Los Angeles*,
   738 F.3d 1058 (9th Cir. 2013) ..............................................................................15

*Perez v. Campbell*,
   402 U.S. 637 (1971).................................................................................................7

*Seattle Affiliate of Oct. 22nd Coalition to Stop Police Brutality v. City of Seattle*,
   550 F.3d 788 (9th Cir. 2008) ..............................................................................14

iii

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)..................................................................................................13

*Telecomms. Regulatory Bd. of Puerto Rico v. CTIA–Wireless Ass'n*,
   752 F.3d 60 (1st Cir. 2014)......................................................................................17

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*,
   489 U.S. 749 (1989)..................................................................................................15

*U.S. Smokeless Tobacco Mfg. Co. v. City of New York*,
   708 F.3d 428 (2d Cir. 2013)......................................................................................8

*United States v. Archuleta*,
   865 F.3d 1280 (10th Cir. 2017) ..............................................................................16

*Universal Commc'n Sys., Inc. v. Lycos*,
   478 F.3d 413 (1st Cir. 2007)......................................................................................9

*Wos v. E.M.A. ex rel. Johnson*,
   568 U.S. 627 (2013)................................................................................................7, 8

**STATE CASES**

*Donaher v. Vannini*,
   2017 WL 4518378 (Me. Super. Ct. Aug. 18, 2017) ............................................4, 6

*Gentry v. eBay, Inc.*,
   99 Cal.App.4th 816 (2002) ....................................................................................3, 4

*MDA City Apartments, LLC v. Airbnb, Inc.*,
   2018 WL 910831 (Ill. Cir. Ct. Feb. 14, 2018) ....................................................4, 5

*Stoner v. eBay, Inc.*,
   2000 WL 1705637 (Cal. Super. Ct. Nov. 1, 2000) ..................................................9

**FEDERAL STATUTES**

18 U.S.C. § 2703(c)(2)..............................................................................................17, 18

## I.     <u>INTRODUCTION</u>

Airbnb's Motion for Preliminary Injunction explained that the City's explicit goal in enacting the Ordinance was to force home-sharing platforms like Airbnb to review, monitor, and remove third-party listings.  The City's Opposition does not hide that objective, and in fact, only confirms that the Ordinance is preempted by federal law and violates the U.S. Constitution.

The City does not dispute that the Ordinance's enforcement mechanism regulates publication activity and thus falls within the CDA's broad preemption provision.  Opp. 6 ("*enforcement* of the Ordinance" will occur "*by removing* ineligible unit listings and *prohibiting* listings without a City registration number") (emphases added); Christopher Aff. (Ex. D to Opp.) ¶ 4.  Instead, the City seeks to distract the Court by throwing out a number of irrelevant, ancillary features Airbnb offers, arguing that they render Airbnb an "information content provider" such that the CDA is inapplicable.  The City does not apply the relevant test, however, because it cannot satisfy it.  The alleged illegality under the Ordinance is a host's decision to publish a third-party listing without a valid registration number or which otherwise is not eligible under City law.  *None* of the ancillary Airbnb features the City points to (*e.g.*, the Superhost rating, Smart Pricing, or Instant Book) contribute to that illegality—as none affect the host's decision to post a listing with or without a registration number.  Rather, as courts specifically have held in rejecting the City's arguments, such features are all "neutral" tools that do not deprive Airbnb of CDA immunity.  *See, e.g.*, *La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1103–05 (C.D. Cal. 2017).  Because compelled monitoring and removal of listings is the intended and necessary consequence of *both* Sections 9-14.10(a) and (b), these provisions violate the CDA and First Amendment.

Nor can the City defend its wide-ranging monthly demand for Airbnb's private business records under Section 9-14.11.  The City concedes that the Ordinance provides no opportunity for precompliance review of this demand, which is required under the Fourth Amendment, Article 14 of the Massachusetts Declaration of Rights, and the SCA.  Implicitly acknowledging the constitutional infirmities of this provision, the City offers a post-litigation "draft" administrative "Bulletin," purportedly showing that the information requested is "public."  This draft document's

1

re-writing of the Ordinance flies in the face of its plain text and legislative history.  Moreover, the City wholly ignores the recent decision of a New York federal district court holding that Airbnb has a reasonable expectation of privacy in its *own* compiled, internal business records, like those at issue here, which contain deeply private and competitively sensitive information.  *See Airbnb, Inc. v. City of New York*, __ F. Supp. 2d __, 2019 WL 91990, at *10 (S.D.N.Y. Jan. 3, 2019).  Further, the requested data at issue here is not "public" even under the City's strained re-interpretation.  Indeed, the City itself concedes that it cannot point to a single public source for how many nights a particular listing is booked in a month, yet it continues to demand that Airbnb produce this highly sensitive data for all listings in Boston.

Finally, the remaining preliminary relief factors tip sharply in Airbnb's favor.  The City does not dispute that Airbnb will be irreparably harmed if it must comply with a preempted, unconstitutional law or face the prospect of massive penalties.  Nor can the City dispute that the "disclosure of private, confidential information 'is the quintessential type of irreparable harm that cannot be compensated or undone by money damages.'"  *Airbnb*, 2019 WL 91990 at *23 (citation omitted).  Airbnb also has demonstrated that the balance of equities and public interest support its request for preliminary relief.  Critically, the City expressly concedes that it "may be able to enforce other portions of the Ordinance against hosts," and thus can address through other means the alleged loss of permanent housing.  Opp. 32.  And the public interest supports vindicating constitutional rights and the supremacy of federal law.  The Ordinance should be enjoined.

## II.   AIRBNB IS LIKELY TO SUCCEED ON THE MERITS

### A.   The CDA Preempts the Ordinance

#### 1.   Section 9-14.10(b) compels Airbnb to remove content and Airbnb is not an "information content provider"

As the City concedes, "Section 9-14.10(b) regulates listings that appear on Airbnb's website," and thus treats Airbnb as a "publisher" of third-party content.  Opp. 22.  The City's *only* argument to save this provision from preemption is that Airbnb is an "information content provider" and thus not protected by the CDA.  *Id.* at 22–23.  The City is wrong.

2

In support of this argument, the City misleadingly suggests that Airbnb has provided the Court with an incomplete description of the content on its website. *Id.* at 8–10; 22–23. To the contrary, Airbnb has provided the Court with a complete description of all *relevant* content. As courts have made clear, "[t]he fact [that a website] is an information content provider *is irrelevant* if [the website] did not itself create or develop the content for which appellants *seek to hold it liable*…. The *critical issue* is whether [the website] acted as an information content provider *with respect to the information that appellants claim* is" unlawful. *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003) (emphases added) (internal quotation marks)). Indeed, the CDA only precludes immunity for websites that do "not merely . . . augment[ ] the content generally, but . . . materially contribut[e] to [the website's] *alleged unlawfulness*." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1167–68 (9th Cir. 2008) (en banc) (emphasis added). "[A] material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible *for what makes the displayed content allegedly unlawful*." *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 410–11 (6th Cir. 2014) (emphasis added). In fact, in recently rejecting the argument that Airbnb is an "information content provider," a district court in California correctly focused on "what allegedly ma[de] the listings 'unlawful,' 'illegal,' or 'offending'" in the plaintiff's view. *Park La Brea*, 285 F. Supp. 3d at 1105.

The ancillary tools the City points to have nothing to do with the alleged illegality necessitating content-removal. Here, the alleged *illegality* necessitating removal is that there is a "listing without a valid registration number" or which otherwise is ineligible on the site. § 9-14.10(b). As Airbnb explained, however, there can be no dispute that third-party hosts—*not* Airbnb—are wholly responsible for publishing listings, registering their listings and complying with City law, and displaying registration numbers in their listings. Mot. 6–7; §§ 9-14.2 & 9-14.6.

Airbnb does not deny that it offers *other* ancillary features like the Superhost rating and Smart Pricing. But those features do not impact the potential violations of the Ordinance; indeed, they have nothing to do with obtaining and displaying a registration number at all. The City never

3

explains how these features are related to the *alleged illegal activity* here, nor can it, since what makes the listings unlawful is *hosts'* failure to obtain and display registration numbers and comply with the law.  To pass the relevant test under the CDA, the City would have to show that using these features somehow *required hosts to not obtain or post their registration numbers*.  *See Roommates.com*, 521 F.3d at 1169 (a "website would be immune, so long as it *does not require* the use of discriminatory criteria" (emphasis added)).  The City does not, and cannot, show that.

Courts consistently have held that "providing neutral tools to carry out what may be unlawful or illicit" acts does not transform a website into an "information content provider." *Roommates.com*, 521 F.3d at 1169.  The tools the City highlights are paradigmatically "neutral" because, at most, they "provide a framework that *could be* utilized for proper or improper purposes." *Id.* at 1172 (emphasis added).  Indeed, they are *precisely* the kind of "neutral" tools that several courts have held to be legally irrelevant to whether Airbnb is an "information content provider." *E.g.*, *Park La Brea*, 285 F. Supp. 3d at 1104–06; *MDA City Apartments, LLC v. Airbnb, Inc.*, 2018 WL 910831, at *13 (Ill. Cir. Ct. Feb. 14, 2018); *Donaher v. Vannini*, 2017 WL 4518378, at *3 (Me. Super. Ct. Aug. 18, 2017).  As these courts have recognized, "[i]mmunity is not foreclosed simply because a website offers more than a 'bulletin board' service." *Park La Brea*, 285 F. Supp. 3d at 1104.  That Airbnb may "offer[] ancillary services, such as user information verification, messaging systems, photography, local occupancy tax collection and remittance, a pricing tool, host insurance, and a guest refund policy," "does not make Airbnb an information content provider." *Id.*; *see also MDA City Apartments*, 2018 WL 910831, at *13 (considering same services and holding that "[n]one of these services involve the Airbnb Defendants actually developing any of the information in the listings"); *Donaher*, 2017 WL 4518378, at *3.

Thus, Airbnb's designations of "rare" finds, "good" prices, and "Superhost status" (Opp. 9, 23, citing Ex. E(1)-(4)) apply automatically to *all* listings meeting certain objective criteria (generated by *users*) and in no way materially contribute to the alleged *illegality* here; none, *e.g.*, have anything to do with obtaining or displaying a registration number in a listing.  Supp. Countryman Decl. ¶¶ 7–12.  Courts consistently have held that similar types of features, like a

4

"Power Sellers" designation for sellers on eBay, do not deprive a website of CDA immunity. *See Gentry v. eBay, Inc.*, 99 Cal.App.4th 816, 834 (2002) (eBay "star symbol and 'Power Sellers' designation is simply a representation of the amount of such positive information received by other users of eBay's web site" and did not affect CDA immunity); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269–70 (9th Cir. 2016) (same as to Yelp "star-rating system"). Services like Smart Pricing and Instant Book (Opp. 10, 23, citing Exs. F, G) are similarly available to all hosts who opt into them. Hosts maintain complete control over any arguable content related to those services (including setting the minimum and maximum prices and having the ability to reject prices set by the tool). *See* Supp. Countryman Decl. ¶ 10. And more to the point, the services do not contribute to any alleged illegality, as courts have expressly held. *Park La Brea*, 285 F. Supp. 3d at 1104 (Airbnb's "pricing tool" did not "contribute[] materially to the alleged illegality of the conduct"). Likewise, applying Airbnb's general policies (such as insurance or cancellation) (Opp. 10, 23, citing Exs. H, I, J) to all hosts and listings (1) does not create content, (2) is applicable to all listings, and (3) again has no bearing on whether a listing is unlawful under the Ordinance. Supp. Countryman Decl. ¶ 12; *Park La Brea*, 285 F. Supp. 3d at 1104 (Airbnb's "host insurance, and a guest refund policy" did not convert Airbnb into information content provider); *MDA City*, 2018 WL 910831, at *13 (same). Contrary to the City's argument, then, Airbnb is not an "information content provider" as to Section 9-14.10(b), and so this provision of the Ordinance violates the CDA.

### 2.   Section 9-14.10(a) impermissibly requires Airbnb to engage in content policing and regulates the design and structure of Airbnb's website

#### (a)   Airbnb, Inc. has standing to challenge Section 9-14.10(a)

The City first argues that Airbnb, Inc. lacks standing to challenge Section 9-14.10(a) because a "separate corporation, Airbnb Payments US accepts fees for booking units listed on the Airbnb website," so any fines would be issued to Airbnb Payments, Inc.,[1] not to Airbnb, Inc. Opp. 12. But the City's argument is contrary to well-established precedent holding that a parent

---

[1] The City appears to refer to Airbnb Payments, Inc. as Airbnb Payments US because Airbnb's Terms of Service refer to Airbnb Payments, Inc. as Airbnb Payments US to distinguish it from other payments entities for non-US users.

company has standing to bring suit on behalf of "wholly owned subsidiaries" where the threatened penalty will cause "actual financial injury" to the parent company. *Franchise Tax Bd. of California v. Alcan Aluminium Ltd.*, 493 U.S. 331, 335–36 (1990) (constitutional challenge to state franchise tax); *see Advanced Nano Coatings, Inc. v. Hanafin*, 478 F. App'x 838, 842 (5th Cir. 2012) ("Generally speaking, Vado, as a parent corporation to ANC, would have standing to bring suit on behalf of ANC."); *Dalton v. Honda Motor Co., Ltd.*, 425 F. App'x 886, 890 (Fed. Cir. 2011) (same). Here, Airbnb Payments, Inc. is a wholly-owned subsidiary of Airbnb, Inc. *See* Supp. Countryman Decl. ¶ 2. Critically, even if the City were to issue fines to Airbnb Payments for processing bookings and transactions, *Airbnb, Inc.* will incur the financial injury of those fines, as in *Alcan Aluminium. Id.* ¶ 3. Separately, because Airbnb, Inc. operates Airbnb's website, it is that entity, not Airbnb Payments, that would incur the burden of policing content, removing and prohibiting listings, and redesigning the website if faced with the Ordinance's steep financial penalties. *Id.* ¶ 4. And indeed, courts specifically have treated Airbnb, Inc. and Airbnb Payments, Inc. "as a collective entity" for the "purpose of section 230 claims." *Donaher*, 2017 WL 4518378, at *3. Given the threat of direct financial harm and the actual burden of compliance, there is no serious question that Airbnb, Inc. has standing to challenge Section 9-14.10(a).[2]

### (b) The CDA Preempts Section 9-14.10(a)

The City argues that Section 9-14.10(a) "does not regulate what can or cannot be said or posted in Airbnb's listings," but rather penalizes Airbnb "only for its *own conduct*, namely, for accepting fees for performing booking services for a Short-Term Rental where such unit is not an eligible Residential Unit." Opp. 13–14. For multiple reasons, the City is wrong.

### (i) Section 9-14.10(a) Compels Content Removal

First, the City cannot escape that the Ordinance's explicit objective and overall enforcement scheme is to require platforms to remove content, thereby directly regulating what listings are published. It makes no difference that Section 9-14.10(a) does so more circuitously by regulating "booking services"; it is designed to achieve the exact same preempted goal.

---

[2] In any event, Airbnb, Inc. could simply move to add Airbnb Payments, Inc. as a plaintiff.

The City makes no secret of its goal of content-removal.  It is crystal clear in an affidavit from the City's Commissioner of Inspectional Services:

> [I]t is my intention to seek to enter into agreements with Booking Agents whereby Booking Agents agree to the following substantive provisions: (1) *to remove* a listing for exceeding the maximum number of days the listing may be offered; (2) *to remove* a listing from a platform that the City informs the Booking Agent it has deemed ineligible for use as a Short-Term Rental; and (3) *to prohibit* hosts from listing any listing without a valid registration number from the City.

Opp., Ex. D (Affidavit of William P. Christopher) ¶ 4 (emphasis added).  Although the Ordinance attempts to accomplish the content-removal objective more directly with the compelled agreements required by Section 9-14.10(b), the City itself states that these agreements are intended to "*facilitate implementation of the required provisions*" of the Ordinance, which of course would include Section 9-14.10(a).  Christopher Aff. (Ex. D to Opp.) ¶ 4.  As the Opposition makes clear, such agreements will "assist *in enforcement* of the Ordinance *by removing ineligible unit listings* and *prohibiting* listings without a City registration number."  Opp. 6 (emphases added)).  Thus, it is plain that the City's overarching enforcement objective and scheme is content removal.

Even apart from the law's purpose, it is well-established that "[i]n determining whether [a local law] conflicts with the federal law, the Court must look to the *effect*" of that law, *New York State Comm'n on Cable Television v. FCC*, 669 F.2d 58, 62 (2d Cir. 1982) (emphasis added) (citing *Perez v. Campbell*, 402 U.S. 637, 652 (1971)), and how such laws are "applied, not merely as they are written," *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977).  Here, the practical effect of Section 9-14.10(a) is to force Airbnb to remove third-party listings.  Mot. 15–17 (citing Countryman Decl. ¶ 36).  The City resists this conclusion, offering two specious counterarguments.  *First*, in contradiction with its repeated statements that the City will compel content removal, it lists a series of hypothetical alternatives Airbnb could engage in (*e.g.*, charging upfront fees for posting), and argues that "Section 9-14.10(a) does not compel Airbnb to do anything to its listings, much less monitor and remove them."  Opp. 19.  Yet by the City's admission, both the practical and intended *effect* of this provision is to "compel" or "require" removal, *id.* (emphasis removed).  And the Supreme Court has clearly held that a preemption

7

analysis requires courts to consider "what the state law in fact does, not how the litigant might choose to describe it." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 637 (2013). Here, Airbnb's unrebutted evidence demonstrates what Airbnb will "in fact do[]," *id.*: "it will have to monitor and review third-party content before the final stage of the booking process occurs to ensure that the fee it accepts is not connected to an ineligible listing, and remove third-party content from its website so that its platform is not cluttered with listings that are unbookable or that create a substantial risk of liability if booked." Countryman Decl. ¶ 37.

*Second*, the City tries, but fails, to distinguish *National Meat Ass'n v. Harris*, 565 U.S. 452 (2012). The City's only apparent answer for why the Supreme Court's reasoning should not be applied here is that *National Meat* involved an "extensive regulatory scheme." Opp. 17. But the Court *never* relied on that fact. Instead, the Court reasoned that California's attempt to regulate the "last stage of a slaughterhouse's business"—*i.e.*, "the s[ale] of meat"—had the practical effect of regulating the slaughterhouse's operations—which is exactly what the relevant preemption provision in the FMIA forbade. 565 U.S. at 463. Likewise, the City's attempt to regulate the "booking" of short-term rentals has equivalent practical effects on Airbnb's publishing activities, and thus falls within Section 230's "capacious conception of what it means to treat a website operator as the publisher or speaker of information provided by a third party." *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016). The City has no answer to this argument.[3]

   **(ii)**   **Section 9-14.10(a) Compels Content Monitoring**

As Airbnb explained (Mot. 14 & n.5), any requirement imposed on it to *monitor* or *review* third-party content is equally paradigmatic publication activity under the CDA, even if content removal is not expressly compelled (which it is here). *E.g.*, *Doe v. Internet Brands, Inc.*, 824 F.3d

---

[3] The City also relies on *San Francisco*'s cramped reading of *National Meat*. *San Francisco* asserted that "cases that have construed *National Meat* in contexts outside the FMIA have limited it to its particular facts." 217 F. Supp. 3d at 1075. In so doing, however, *San Francisco* cited only one such case: *U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428 (2d Cir. 2013). But *Smokeless Tobacco* addressed a preemption provision with a saving clause allowing states to regulate the "sale … of tobacco products." *Id.* at 434–35. The CDA contains no such clause, and *National Meat*'s reasoning as to the practical effects of sales regulation applies with full force here.

846, 852–54 (9th Cir. 2016) (CDA preempts requirement to "edit, monitor, or remove user generated content"). That alone dooms Section 9-14.10(a). As courts have held with respect to eBay and other online marketplaces, "Congress intended to remove any legal obligation of [websites] to attempt *to identify or monitor* the sale of [allegedly unlawful] products," as "the threat of liability for failing to monitor effectively would, in the judgment of Congress, deter companies . . . from making their service available as widely and as freely as possible." *Stoner v. eBay, Inc.*, No. 305666, 2000 WL 1705637, at \*2–3 (Cal. Super. Ct. Nov. 1, 2000); *see also Roommates.com*, 521 F.3d at 1174 (website could not be liable for housing discrimination based on content posted by third parties because it would have to engage in the publisher activity of "reviewing every essay . . . to distinguish unlawful discriminatory preferences from perfectly legitimate statements").

Here, the actual operation of Section 9-14.10(a) compels Airbnb to review and monitor third-party content. The City's proposed interpretation of this provision confirms this:

> To assist with determining whether a unit falls into one of the four categories [of units not eligible for short-term rental], the City maintains a dataset ([the] 'List') that lists eligibility categories as spelled out in the Ordinance for each unit in the City…. Using the List, … any Booking Agent, may easily tell whether a unit is eligible [to] be registered if it has a 'Y' (standing for 'Yes') in any of the columns relating to the three permissible Short-Term Rental types: a Home-Share Unit, a Limited Share Unit, or an Owner Adjacent Unit.

Opp. 3–4; *see* Declaration of Stefanie Costa Leabo ¶¶ 2–3 (same). If that were not enough, the City also explains that if the listing "does not include a registration number, it is illegal." Opp. 21. In other words, the City concedes that, at a minimum, to avoid a significant financial penalty for accepting a fee for a booking involving an unlawful short-term rental, Airbnb would need to review each listing, and compare it to the City's list of all housing units in Boston (before it either published the listing or permitted a "booking"). This requirement is impermissible under the CDA.

### (iii) The City cannot distinguish controlling Circuit precedent protecting a site's "design and operation"

The First Circuit has held that the CDA protects a platform's decisions regarding "features that are part and parcel of the overall design and operation of the website" as to third-party content. *Jane Doe*, 817 F.3d at 21; *Universal Commc'n Sys., Inc. v. Lycos*, 478 F.3d 413, 418–19 (1st Cir.

2007).  The City struggles to narrow this capacious test.  It contends that the "holdings in *Lycos* and [*Jane Doe*] only protect website construction and operation to the extent that such features reflect general decisions about what gets posted.… That language and reasoning does not extend to Airbnb's booking services just because it 'designed' its website to also provide payment processing services."  Opp. 16.  The City's narrow-minded argument fails for several reasons.

*First*, the City misreads these decisions.  *Jane Doe* unambiguously held that the CDA protects a website's "acceptance of anonymous payments."  817 F.3d at 20.  But the City does not explain how the "acceptance of anonymous payments" is any different from allowing users to book short-term rentals on the same website, with a single click.  Both features unmistakably deal with payment—not content—and both are integral to the design and operation of each website.  Under First Circuit precedent, then, Airbnb's booking and payment-related decisions as to third-party listings are "no less publisher choices, entitled to the protections of section 230(c)(1)."  *Id.* at 21.

*Second*, the City cannot satisfy its own test under its misreading of First Circuit precedent.  As Airbnb explained in its unrebutted declaration, it intentionally designed its website to collect fees for its platform, including publishing services, at the time of a transaction—not when a host posts her short-term listing.  "Not charging hosts an upfront fee for listing their rentals removes barriers to entry and *makes it more likely for hosts to post their listings on Airbnb*.  . . .  Collecting a fee instantaneously in conjunction with booking assures hosts and guests that their rental transaction is complete, *without any intervening review by Airbnb*."  Countryman Decl. ¶ 6 (emphasis added).  Airbnb has determined that hosts will publish more if it (1) allows listing and booking on the same website; (2) charges a fee at the time of booking and not at the time of posting; and (3) allows instantaneous booking *without* intervening review of the content of each listing.  This design reflects Airbnb's "general decisions about what gets posted."  Opp. 16.

      **(iv)**    ***San Francisco* and *Santa Monica* Are Distinguishable, Wrongly-Decided Outliers**

Predictably, the City's last resort is to rely on two inapposite and incorrectly decided California district court decisions:  *Homeaway.com, Inc. v. City of Santa Monica*, Nos. 16-cv-

06641, -06645, 2018 WL 3013245, at *8 (C.D. Cal. June 14, 2018), *appeal docketed*, No. 18-55805 (9th Cir. June 19, 2018), and *Airbnb, Inc. v. City & County of San Francisco*, 217 F. Supp. 3d 1066 (N.D. Cal. 2016).  Notably, while citing these outlier cases, the City does not address the substantial body of case law Airbnb cited (Mot. 16–17 & n.6), in which courts held that the CDA protects online marketplaces that process similar financial transactions.

Regardless, *San Francisco*'s reasoning is inapt, and *Santa Monica* relied entirely on *San Francisco*'s flawed reasoning.  *San Francisco* turned on that court's characterization of the record in that case.  *San Francisco* denied CDA immunity because plaintiffs "failed to submit evidence showing that the Ordinance will in fact inevitably or perforce require them to monitor, remove or do anything at all to the content that hosts post."  217 F. Supp. 3d at 1075.  Here, by contrast, Airbnb's declarant states that Airbnb "would necessarily require Airbnb to monitor and remove such listings" to comply with Boston's Ordinance.  Countryman Decl. ¶ 37.  Strikingly, Boston submitted *no contrary evidence* in response, and as shown above, *concedes* that content removal is the Ordinance's overarching enforcement objective and scheme.  Thus, the record here, in stark contrast to *San Francisco*, demonstrates that the Ordinance requires Airbnb to engage in the very review, monitoring, and removal of third-party listings that Section 230 guards against.

In any event, *San Francisco* is wrong as a matter of law and should not be followed.  At a minimum, *San Francisco* (like the City here) failed to mention—much less distinguish—the many cases that have uniformly held the CDA provides immunity to websites for claims arising from facilitating online transactions (Mot. 16–17 & n.6).  Indeed, *San Francisco* acknowledged that "StubHub and eBay and . . . other sites that facilitate commercial transactions . . . have all, without exception, been found to be covered by Section 230," Blavin Decl., Ex. A at 40:11–15, but the court inexplicably ignored this case law.  And in discounting the First Circuit's decision in *Jane Doe*, which binds this Court, *San Francisco* stated that "the First Circuit appears to take a more expansive view of Section 230(c) preemption than the Ninth Circuit."  217 F. Supp. 3d at 1073.

*San Francisco* also did not explain how its ruling could be squared with the CDA's purpose of promoting e-commerce; that court (like Boston, *see infra* at Section II.A.3) did not consider that

its ruling would undermine CDA immunity for thousands of websites that facilitate and provide services for third-party transactions.  Given these conspicuous mistakes, and controlling First Circuit precedent, this Court should not rely on the faulty analysis in these cases.

       **3.**       **Section 9-14.10 is obstacle preempted**

Section 9-14.10 stands as an obstacle to Congress's purpose of promoting e-commerce in enacting the CDA.  *See* Mot. 18–19.  The City completely ignores this argument and therefore waives any response.  *See Coons v. Industrial Knife Co.*, 620 F.3d 38, 44 (1st Cir. 2010).

     **B.**       **The Ordinance Violates the First Amendment and Article 16**

       **1.**       **Section 9-14.10(b) applies to speech that is lawful on its face**

The City does not dispute that the Ordinance's agreement-forcing provision (Section 9-14.10(b)) regulates speech.  Opp. 25.  It instead offers two responses to Airbnb's claim that this provision violates the First Amendment.  Both are meritless.

*First*, the City relies on the *Santa Monica*'s misreading of *Braun v. Soldier of Fortune Magazine*, 968 F.2d 1110 (11th Cir. 1992).  *Santa Monica* wrongly concluded that *Braun* "did not hold[, as Airbnb contends,] that the First Amendment protected advertisement of illegal conduct unless the illegality appeared 'on its face.'"  2018 WL 3013245, at *6 (C.D. Cal. June 14, 2018).  But that is *precisely* what *Braun* held.  The Eleventh Circuit made clear that a publisher can be held liable for printing an ad relating to illegal activity "*only if the advertisement on its face* would have alerted a reasonably prudent publisher to the clearly identifiable unreasonable risk of harm to the public that the advertisement posed."  *Braun*, 968 F.2d at 1115 (emphasis added).

*Santa Monica* and the City try to cabin *Braun*'s holding to the negligence context, but *neither* explains why the First Amendment affords any less protection when a municipality tries to impose direct civil liability based on an advertisement that is not clear "on its face."  As in the negligence context, Airbnb's inability to assess legality on the face of a listing creates a "fear of liability" that might "impermissibly impose a form of self-censorship," raising the risk that speech will be "impermissibly chill[ed]."  *Braun*, 968 F.2d at 1117–19; *see* Countryman Decl. ¶ 38.  The City therefore cannot distinguish *Braun*, and cannot escape its First Amendment implications.

*Second*, the City contends that the third-party listings regulated here are illegal on their face because "the Ordinance provides clarity: where an advertisement does not include a registration number, it is illegal."  Opp. 21.  But the Ordinance's plain text says *nothing* about facial clarity.  It provides that "any Booking Agent who accepts a fee for booking a unit as a Short-Term Rental, where such unit is not an eligible Residential Unit, shall be fined three hundred dollars ($300) per violation per day."  § 9-14.9(a).  In fact, the City repeatedly relies on the fact that Airbnb must monitor listings and *cross-reference them* to determine legality, even if the listing lacks a registration number.  *See supra* 9.  That review process would be wholly unnecessary if lack of facial clarity were sufficient to eliminate liability under the Ordinance.

And indeed, the City relies on a draft "Bulletin," explaining that the "Commissioner will only fine a Booking Agent that collects a fee for booking a unit that the List categorizes as not eligible to be registered."  Opp. 6.  If a listing contains a false or invalid registration number, Airbnb would only know that the listing is "not eligible to be registered" by investigating the City's database.  Thus, this draft interpretation would still require Airbnb to *review listings and compare* them to the City's database to determine whether they are lawful; by definition, the legality of a listing cannot be determined "on its face" and imposes on Airbnb "a duty to investigate every ad it publishes," in violation of the First Amendment.  *Braun*, 968 F.2d at 1113; *supra* 5–6.

### 2.   Section 9-14.10(a) imposes a financial burden on speech

As to Section 9-14.10(a), the City does not grapple with Airbnb's contention that this provision imposes a financial burden on commercial speech.  Mot. 19–23.  The City states (at 20) that "[i]t regulates business conduct" and "is directed only at Airbnb's non-expressive conduct," again relying on *San Francisco*, 217 F. Supp. 3d at 1076.  This, again, is a false distinction. Contrary to the City's conclusory assertions, the Ordinance does not inflict an "incidental" burden on commercial speech.  By targeting financial transactions connected to listings, it imposes a direct "financial burden" that impermissibly "silence[s] unwanted speech by burdening its utterance [rather] than by censoring its content."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).[4]

---

[4] The City's only other argument is its misreading of *Braun*, which is meritless (*supra* 12).

C.      **The Ordinance Violates the Due Process Clause and Article 12**

In response to Airbnb's due process argument regarding the Ordinance's *limitless* agreement-forcing provision, *see* Mot. 23–24, the City's only response is that it "will not implement the agreements in a manner that violates" the federal and state constitutions, pointing to a "draft Commissioner's Bulletin," Opp. 24–25.  But the City cannot escape due process liability on the basis of this draft document.  This *unfinished, unenacted* material provides no comfort to Airbnb, particularly where it is inconsistent with the law's plain text.  *See Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991) ("administrative interpretation of a statute contrary to language as plain as we find here is not entitled to deference"); *Seattle Affiliate of Oct. 22nd Coalition to Stop Police Brutality v. City of Seattle*, 550 F.3d 788, 799 (9th Cir. 2008) (refusing to credit limiting construction offered by city because there was no well-established practice or official administrative guidance); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1050 (S.D. Cal. 2006) (refusing to consider City Manager's purported "interpretation" of ordinance because it would "effectively amend a city ordinance" contrary to the ordinance's "plain language").  The City effectively concedes that the Court should issue a preliminary injunction while the parties negotiate based on its proposed draft Bulletin, by solely pointing to the draft Bulletin in opposition.

D.      **Section 9-14.11 Violates the Fourth Amendment and Article 14**

The City does not, and cannot, contend that its Ordinance provides Airbnb with "an opportunity for precompliance review" of its sweeping monthly data demands.  *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015).  Nor does it address *Airbnb, Inc. v. City of New York*, 2019 WL 91990 (S.D.N.Y. Jan. 3, 2019), which recently enjoined a similar mandatory data disclosure provision on Fourth Amendment grounds.  The City's *only* argument in defense of its monthly reporting requirement is that Airbnb lacks a reasonable expectation of privacy in the information the Ordinance compels Airbnb to disclose because that information is already generally available to the public.  Opp. 30.  The City is wrong—several times over.[5]

---

[5] The City correctly does not argue that user consent (which is absent here, *infra* 18) would be a defense to the Fourth Amendment.  As *New York* held, "whether users of the platforms" consent

*First*, the City fails to appreciate an essential fact:  the Ordinance requires Airbnb to disclose *Airbnb's own* confidential business records.  *Airbnb*, 2019 WL 91990 at \*10 ("But the Supreme Court in *Patel* implicitly recognized—and the *en banc* decision of the Ninth Circuit, which the Supreme Court affirmed, explicitly held—that the records at issue were ones in which the *hotel owners* had a reasonable expectation of privacy.").  Those records contain, in one easily searchable place, *all* of the information that the City insists is publicly available in each host's individual listing.  Even if the underlying information in Airbnb's records is publicly accessible in each listing—and it is not—Airbnb has a reasonable expectation of privacy in the *compiled* monthly data in its own *internal* business records for *all* listings in Boston.  *E.g.*, *U.S. Dep't of Justice v. Rep. Comm. for Freedom of Press*, 489 U.S. 749, 764 (1989) (under Fourth Amendment, "[p]lainly there is a vast difference between the public records that might be found after a diligent search" and "a computerized summary located in a single clearinghouse of information").

Indeed, as the Ninth Circuit pithily explained in *Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013) in rejecting this very argument, "if the records were publicly accessible, the police of course would not need to rely on § 41.49 to gain access to them."  So, too, here.  If the City is somehow correct that the information it seeks were publicly-accessible on Airbnb's website, it can obtain that data through the website, and it does not need the Ordinance's sweeping monthly demand for Airbnb's private records.  If, however, the City needs the law, it must be because Airbnb's records are *not* publicly accessible (or at least in the form the City desires).  As such, even if the City were correct that all individualized listing data were "public," Airbnb has a reasonable expectation of privacy in the compiled data the law demands from its internal records.

*Second*, contrary to the City's contention, the information that must be included in Airbnb's monthly report is *not* public.  Even the City concedes that Airbnb does not make public the "number of nights each unit was reported as occupied."  Opp. 29 n. 10.  The best the City can do to justify this request is to rely on a listing's "calendar availability."  But the City acknowledges

---

to the "disclos[ure] [of] user data to regulators" does "not deprive the *platforms* of the right to claim a reasonable expectation of privacy in their business records."  2019 WL 91990 at \*12.

that a listing's "calendar availability" is not "precisely equivalent" to the information the Ordinance compels each month. *Id*. Indeed, it is not even close to equivalent. That is because a unit may not be available for any number of reasons beyond the fact that the unit already is booked, including that the owner simply does not want to rent it out for those days. And critically, such usage data is highly confidential and competitively sensitive. Countryman Decl. ¶ 40. As *New York* recognized, Airbnb has "very good reasons to keep" data regarding "usage patterns" confidential, including "[k]eeping such data" from "rivals (whether competing platforms or hotels) who might exploit it." 2019 WL 91990, at *11. Those concerns are particularly important here, where there is nothing in the Ordinance to protect such information from being publicly disclosed (such as via public records act requests), including to Airbnb's competitors. And even if, as the City claims, the *rest* of the requested data is publicly accessible (which is wrong), such data *is confidential* when *coupled* with the usage data. Airbnb's usage patterns by location (even by "neighborhood," as the City seeks to rewrite), together with whether the units are for a "room or whole unit," is highly confidential and proprietary in the aggregate. Supp. Countryman Decl. ¶ 13.

Moreover, the City's attempt to retreat from the plain language of the Ordinance to convert the "location" of a listing into public information fails. The law requires the report to include the "location" of each listing, which ordinarily would mean its specific address. *See United States v. Archuleta*, 865 F.3d 1280, 1287–88 (10th Cir. 2017) (the "term 'location' [in statute] is commonly defined to mean" the "*specific place or position of a person or thing*." (emphasis added)). This plain meaning is confirmed by the legislative history. During debate on the bill, for example, Councilor Ciommo stated: "I think, if we get the short-term rental platforms to provide us a University Accountability-like *report that gives us addresses and number – and basically, by address – that's how we would enforce it. I hope that that clarifies*." Blavin Decl., Ex. B at 1 (emphases added). Indeed, the reason why the City wanted the listing *address* is because Airbnb does not disclose user-inputted addresses on its site. Supp. Countryman Decl. ¶ 15.

But now, ignoring the language and legislative history of the Ordinance, the City claims in a draft "Bulletin" that it will construe "location" to be the "neighborhood" where a listing is located

16

(without defining what "neighborhood" actually means). But this reading should be given little weight, particularly because it contradicts the plain text of the ordinance (*supra* 16–17). Indeed, an "administrative interpretation developed during, or shortly before, the litigation in question is entitled to less weight than that of a long-standing administrative interpretation." *George v. Nat'l Water Main Cleaning Co.*, 2013 WL 5205846, at *7 (D. Mass. Sept. 16, 2013) (citation omitted).[6]

For all of these reasons, Airbnb's private business records are entitled to a reasonable expectation of privacy. Given the lack of any pre-compliance review for this invasive reporting required, the Court should enjoin Section 9-14.11 under the Fourth Amendment and Article 14.

### E.    Section 9-14.11 Violates the SCA

The City does not contest that the Ordinance fails to provide the legal process required under the Section 2703(c) of the SCA. *See* Opp. 25. Indeed, the City concedes that the Ordinance impermissibly provides, as the First Circuit once said, "no process whatsoever." *Telecomms. Regulatory Bd. of Puerto Rico v. CTIA–Wireless Ass'n*, 752 F.3d 60, 62 (1st Cir. 2014).

Instead, the City argues that Section 2703(c) does not apply at all because "the information requested by the Ordinance pertains to *listings* . . . not to Airbnb's customers themselves." Opp. 26. But the City's distinction between "listings" and "hosts" is nonsensical. A listing cannot be disconnected from a living, breathing host; a host creates that listing, and includes the address. What's more, with the listing address, the City can potentially cross-reference hosts' names and other personally identifying information, and the City also obtains their detailed transactional data (number of nights booked). Put simply, then, the City's demand for information about a *listing* is no different from compelling the disclosure of information about a *host*. Nor is it any different from the Puerto Rican law that requested subscriber information in connection with a "pre-paid mobile telephone," not a customer. *CTIA–Wireless Ass'n*, 752 F.3d at 62. All require legal process under Section 2703(c) of the SCA. *See HomeAway.com, Inc. v. City of Portland*, No. 3:17-cv-

---

[6] At a minimum, if the Court were to conclude that data like "location" in Airbnb's business records is not entitled to a reasonable expectation of privacy, then it should enjoin the City from enforcing Section 9-14.11 to the extent it requires disclosure of *anything* other than that information and it should bind the City to its proposed narrowing of the data required in the reporting requirement.

00091-MO (D. Or. Feb. 27, 2017) (Blavin Decl., Ex. C at 36:2–12) (holding that for home-sharing platform, requirement to provide listing addresses with no process violated SCA; "the information required comes within the set of information that the act protects from disclosure").

Next, the City argues that the Section 9-14.11's monthly reporting requirement falls into one of the SCA's exceptions because Airbnb's users have consented to Airbnb's disclosure of this data by agreeing to its Privacy Policy.  Opp. 28.  But that policy does not eliminate the need for the City to obtain legal process.  To the contrary, it simply informs Airbnb users that Airbnb will sometimes have to comply with *valid* legal process from the government.  *Id*. (quoting policy stating Airbnb will disclose data "'to the extent we are required or permitted to do so by law'"); Supp. Countryman Decl. ¶ 14; *Airbnb*, 2019 WL 91990, at *2 ("Airbnb's Privacy Policy, in turn, provides that Airbnb will disclose users' personal information *only in response to valid legal requests*, including those from government" (emphasis added)).  Because Section 9-14.11 fails to provide *any* pre-compliance review, it is not *valid* legal process, and the Privacy Policy is inapplicable.  *E.g.*, *In re Appl. for Tel. Info. Needed for a Crim. Invest.*, 119 F. Supp. 3d 1011, 1038 n.12 (N.D. Cal. 2015) ("As the Verizon policy makes clear, cell phone users at most can consent to 'valid' court orders—i.e., those that are not constitutionally infirm.").  If such a policy eliminated the need for valid process, it would decimate the core of the SCA's protection for users.

The City also erroneously relies (Opp. 28) on *New York*, 2019 WL 91990, at *20–22, which held that Airbnb's SCA claim was "colorable," but "[o]n the present record," it was not "yet prepared to conclude that plaintiffs [were] likely to prevail on the merits."  *Id*.  In reaching that conclusion, the court focused on the fact that the New York ordinance *compelled* platforms to "obtain from each host … lawful consent to provide the information covered."  *Id.* at *21 (internal quotation marks omitted).  This Ordinance does no such thing.  As the Opposition demonstrates, far from requiring Airbnb to obtain lawful consent, the City (wrongly) *assumes* that Airbnb hosts have given such consent.  Boston has not introduced a shred of evidence that *any* hosts, much less *all* Boston hosts, believe they have consented to disclosure under the Ordinance.  Supp. Countryman Decl. ¶ 14.  On this record, then, the City has not carried *its burden* of establishing

18

user consent.  *E.g.*, *Freedman v. Am. Online, Inc.*, 303 F. Supp. 2d 121, 129 (D. Conn. 2004).

*Third*, the City's argument that the required information is available to the public (Opp. 28) is incorrect for the reasons set forth above.  *Supra* 15–16.

## III.    THE OTHER PRELIMINARY RELIEF FACTORS SUPPORT AIRBNB

The remaining preliminary relief factors favor Airbnb's motion for preliminary relief.  To begin, the City does nothing to diminish Airbnb's claim of irreparable harm.  *First*, the City does not dispute that Airbnb will be irreparably harmed if the Ordinance violates its constitutional rights or if Airbnb is forced to comply with a preempted law.  Mot. 29–30.  *Second*, the City wrongly argues that "Airbnb has not explained how" the Ordinance would harm consumer goodwill.  Opp. 32.  Airbnb submitted a declaration explaining precisely how being forced to alter the operation of its platform and turn over confidential information would injure customer goodwill.  Mot. 29–30 (citing Countryman Decl. ¶¶ 35–39).  The City has *no answer* to this record evidence.  And as the *New York* court recently held, the "disclosure of private, confidential information 'is the quintessential type of irreparable harm that cannot be compensated or undone by money damages,'" and, as here, the "Ordinance does not appear to place meaningful limits on the City's ability to disseminate the information it collects, either to other government offices or to the public at large."  *Airbnb*, 2019 WL 91990 at *23–24.  Not only will users lose trust in Airbnb's services, but "competitors—whether rival home-sharing platforms or members of the hotel industry—could gain sensitive information about the workings of plaintiffs' businesses."  *Id.* at *24.

*Third*, the City's contention that Airbnb will not suffer irreparable harm because it faces only *prospective* fines (Opp. 31) is contrary to well-established precedent holding that irreparable harm occurs whenever a party faces a "choice" between exposing itself to potential liability or complying with a challenged law that will be enforced.  *E.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  Here, that liability is enforced by high fines, and the City offers no reason why Airbnb should have to bear those costs during the pendency of this action.[7]

---

[7] The City's other arguments regarding the Ordinance's fines are meritless.  For example, the City contends that Airbnb can seek indemnification from users for fines that the City may impose.  The

Likewise, Airbnb has demonstrated that the balance of equities and public interest support its request for preliminary relief.  Critically, the City does not dispute that its enforcement measures against hosts are available right now, or that it can obtain Airbnb's business records if it prevails at the end of this litigation.  Opp. 32–33.  In fact, the City expressly *concedes* that it "may be able to enforce other portions of the Ordinance against hosts."  *Id*. at 32; *compare* Mot. 30.

The City's only argument as to these factors is that "allowing Airbnb to continue to accept fees for booking illegal units will have the detrimental effect of continuing to encourage the unavailability and unaffordability of permanent housing stock."  Opp. 32.  But the City has not submitted any *actual* evidence that Airbnb "facilitate[s] thousands of illegal transactions," that such purported transactions affect housing stock, or that the City's *conceded ability* to enforce against hosts would not reduce such transactions and protect the housing stock.  *Id.*  The only "evidence" it cites is a conclusory statement by the Mayor that "unchecked commercialization of short-term rental uses in residential properties *has potential* to increase pressure on our already strained housing market."  Ex. B to Opp. (emphasis added).  The Mayor's unsworn statement about the *potential* impacts of home-sharing generally proves nothing about the housing market.

Nor does the City dispute that that "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), or that the public interest is served by enforcing federal statutes that preempt local laws, *Grafton and Upton R.R. Co. v. Town of Milford*, 337 F. Supp. 2d 233, 239 (D. Mass. 2004); Mot. 30.

Thus, it is clear that all four factors support preliminary relief.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the Motion.

---

City's failure to appreciate how greatly consumer goodwill would be harmed by having to seek such indemnification, particularly in response to an unlawful law, only further highlights how little it appreciates the concept of consumer goodwill.  Similarly, it is no answer that the City now states—in a legal filing and not even in one of its supporting declarations or "draft Commissioner's Bulletins"—that it will refund any fines issued while the Court is considering this case.  Opp. 31. The City does not cite a case in which preliminary relief was denied on the pledge of a refund.

Respectfully submitted,

AIRBNB, INC.,

By its attorneys,


/s/ Howard M. Cooper
HOWARD M. COOPER (BBO #543842)
hcooper@toddweld.com
CHRISTIAN G. KIELY (BBO #684308)
ckiely@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel: (617) 720-2626
Fax: (617) 227-5777

CHAD GOLDER (*Pro hac vice*)
chad.golder@mto.com
ADELE M. EL-KHOURI (*Pro hac vice*)
adele.el-khouri@mto.com
MUNGER, TOLLES & OLSON LLP
1155 F Street NW, 7th Floor
Washington, DC 20004-1361
Tel: (202) 220-1100
Fax: (202) 220-2300

JONATHAN H. BLAVIN (*Pro hac vice*)
jonathan.blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-4000
Tel: (415) 512-4000
Fax: (415) 512-4077

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via the Court's electronic filing system, and served to all counsel of record on March 8, 2019.

/s/ Christian G. Kiely
Christian G. Kiely